STATE, Respondent, v. AMUNDSON, Appellant.

*No. State 194. Argued June 5, 1975.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 775.)

For the appellant there were briefs by *Howard B. Eisenberg*, state public defender, and *Robert J. Paul*, assistant state public defender, and oral argument by *Mr. Paul*.

For the respondent the cause was argued by *William L. Gansner*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

CONNOR T. HANSEN, J. In February, 1973, while driving to Eau Claire from Superior, police undercover agent, David M. Gray, a/k/a David Willie, picked up two hitchhikers. Gray declined an offer to buy marijuana from the hitchhikers. Gray told the hitchhikers, however, that he was interested in buying a large quantity of marijuana. The hitchhikers took Gray's name and phone number and told him someone would contact him. One week later, in Superior, Gray received a phone call from the defendant who offered to sell Gray some marijuana. The defendant informed Gray that he had suppliers and could sell Gray as much marijuana as Gray desired. A meeting was arranged for March 1, 1973, in the student union at the University of Wisconsin-Superior to conduct the sale. The defendant admitted that he had received the note from the hitchhikers and that he contacted Gray for the purpose of selling marijuana to him. He testified, however, that he did not know where to get the marijuana, and assumed that the note was given to him by the two hitchhikers because he had openly discussed buying some land in Afghanistan where marijuana could legally be raised.

On March 1, 1973, the police gave Gray $165 to make the purchase. Gray went to the Student Union Building at the University of Wisconsin-Superior, at 11:15 a.m., at which time he gave the money to the defendant, with

the understanding that one pound of marijuana would be delivered to Gray that night. The defendant admits that he accepted the money, intending to get the marijuana for Gray. That evening an electronic device was attached to Gray's body at the Superior police department so that his conversations could be monitored. A second monitoring device was made available and given to University Security Officer George Sandmon to be used by Sandmon in monitoring Gray's conversation while in the Union on March 1st. Sandmon, without the knowledge of Gray or the Superior police, apparently attempted to tape these conversations by placing a cassette tape recorder near the monitor. This tape and others were subsequently erased in a bulk erasure by the university security officers at the end of the then-current school semester.

The defendant testified that he arrived at the Union at 7 p.m. that evening to meet Gray but had to leave before Gray arrived. The defendant left a message with a friend, Diane Prettie, that he would return and that Gray was to wait.

Gray testified that he arrived at the Union at about 7:15 p.m. He asked the bartender in the Union beer bar if he had seen the defendant, receiving a negative response. Gray stated that he was approached by Prettie at 7:20 p.m., who delivered the defendant's message. They talked for a short time, but Gray stated that he did not pay much attention to the conversation as he was nervous and looking for the defendant. Gray testified that the conversation was cut off by the defendant's arrival at 8 p.m.

Prettie, when called by the defense, testified that she talked to Gray for twenty-five minutes in the snack bar and an additional five minutes in the beer bar. She stated that Gray appeared very upset and angry and made repeated threats against the defendant assuming that the defendant was double-crossing him. Prettie testified that Gray indicated he was syndicated and a mem-

ber of the criminal underworld and that his people would kill the defendant if he was "ripping him off." Prettie also stated that Gray told her he had shot a man that night in Hibbing, Minnesota, for crossing the organization. Prettie further testified that Gray had a cut on his nose which Gray told her was from the Hibbing incident.

Clyde Timothy Hanna, the bartender at the Union beer bar, also testified for the defense that Gray looked erratic, like he was "on something" the night of March 1, 1973.

Gray categorically denied making any of the statements attributed to him by Prettie. He admitted being nervous and that he had had four drinks before coming to the Union.

After Gray and Prettie were joined by the defendant in the Union, the defendant and Gray went to a separate table. The defendant informed Gray that he could not get the marijuana. Gray testified that the defendant wanted to check a few more places before returning the money. The defendant claimed that he told Gray he wanted to back out of the deal, but that Gray threatened him, talking about what the syndicate did with double-crossers and what had happened to the man in Hibbing. The defendant described Gray as not appearing nervous; rather, he was "cool and collected."

Gray and the defendant left the Union and went to the defendant's apartment, where the defendant retrieved the money and made some additional contacts on the phone to try to get the marijuana. According to the defendant, Gray refused the money and continued to threaten him. The two proceeded to Duluth, where the defendant stopped at a friend's house, allegedly to get help because he feared Gray's threats. The defendant stated that during this ride Gray indicated he had a gun.

According to the testimony of the defendant, the two men then drove from Duluth back to the Union and went in for a cup of coffee. Gray's threats allegedly continued,

but he took the money back from the defendant with the understanding that the defendant would obtain the marijuana. While in the Union, they were joined by the defendant's wife who later went with the defendant to another restaurant where the defendant told her of the threats. Rather than seek assistance from the police, defendant decided that the only way to get rid of Gray was to sell him the marijuana.

Gray, at all times, denied that he made any threats or mentioned any syndicate or made any reference to Hibbing, Minnesota, to the defendant, or to anyone else. He also denied telling the defendant that he had a gun. He stated that upon returning to the Union from Duluth, the defendant suggested that Gray buy five pounds of marijuana as it would be easier to get that amount. The defendant also asked if Gray wanted to buy some cocaine. Gray further testified that the defendant said he was afraid to sell to him because he suspected Gray was a narcotics' agent.

Becky Amundson, defendant's wife, testified for the defense that she joined the defendant and Gray at about 9:45 p.m. in the Union on March 1, 1973. She also corroborated the defendant's testimony that she was told of the threats made by Gray.

Prettie and the defendant testified that she told the defendant about the alleged threats by Gray on March 2, 1973. The defendant was also informed by friends that he and Gray were being watched by the police. The defendant stated that he thought this was because Gray was a member of the underground, but could not explain why he then did not go to the police for help, except to say that he didn't think the police would help him.

The defendant called Gray thereafter and made another appointment to meet him at the Union on March 5, 1973. Gray and his car were thoroughly searched before the meeting by the police. The police observed the defendant put something in the back of Gray's car in the Union

parking lot. Gray subsequently met the defendant on the steps to the Union, at which time the defendant told him the marijuana had already been placed in Gray's car. Payment was then made. Gray testified that the defendant again offered to supply him with five pounds of marijuana a week, and Gray stated that he would check with his people and left. The marijuana was subsequently found by the police in the rear seat of Gray's car.

The defendant testified that he only went through with the deal because he was scared of Gray. He stated that he had no source of supply and that it was necessary to ask 15 to 20 people where he could obtain the one pound of marijuana which he finally bought from someone at school whom he didn't know.

The defendant was arrested on March 15, 1973. At the time of his arrest $901.40 was found in his possession. This fact was admitted into evidence over defense objection.

A statement by the defendant, confessing to the sale, was also admitted into evidence. The defendant objected to those portions of the statement which asserted that defendant's claims to Gray that he was a dealer in drugs were lies, on the grounds that such portions were prejudicial and not relevant to the issues in question.

The court instructed the jury with regard to the defense of coercion, and, sua sponte, on the defense of entrapment.

Additional facts will be discussed in considering the issues raised by the defendant on this appeal.

The following issues are dispositive of this appeal:

1. Did the trial court commit reversible error in sua sponte giving an entrapment instruction?

2. Did the trial court commit reversible error in allowing, over objection, material with regard to the defendant's prior drug activities to come before the jury?

3. Was the defendant denied due process because of the failure of the state to give the defendant a copy of Officer Larsen's surveillance report until after trial?

4. Did the trial court commit reversible error in admitting the testimony concerning the amount of money found in the defendant's possession at the time of his arrest?

5. Did the destruction of the tape of the conversations on March 1, 1973, between Prettie, the defendant, and Gray, deny the defendant due process and a fair trial requiring dismissal of the charge or a new trial?

*Entrapment instruction.*

The defendant contends that his defense was that of coercion, as set forth in sec. 939.46 (1), Stats.[1] He argues that since his defense was coercion, it was the only instruction that should have been given the jury, and, therefore, it was prejudicial error for the trial court to also give an entrapment instruction over the objections of the defendant.

Initially, the state contends that the defendant never made a timely objection and therefore any objection was waived. A complete review of the record persuades us that a timely and proper objection was made.

However, the question remains as to whether the giving of both an instruction on coercion and entrapment constituted prejudicial error.

Upon cross-examination of the defendant by the state, the district attorney inquired as to whether the defendant

[1] "939.46 **Coercion.** (1) A threat by a person other than the actor's co-conspirator which causes the actor reasonably to believe that his act is the only means of preventing imminent death or great bodily harm to himself or another and which causes him so to act is a defense to a prosecution for any crime based on that act except that if the prosecution is for murder the degree of the crime is reduced to manslaughter."

had ever sold marijuana. The trial court sustained the objection of the defendant on the grounds that predisposition was not relevant to the defense of coercion. However, at the conclusion of the trial, the trial court advised the parties that it had decided to give an instruction on both entrapment and coercion. The defendant objected to the giving of the entrapment instruction. The motion of the state to re-open the trial to introduce evidence on predisposition was denied.

It is well recognized by this court, as well as the courts of other jurisdictions, that a trial court should not give an instruction where the evidence does not reasonably require it. *State v. Boutch* (1973), 60 Wis. 2d 397, 401, 210 N. W. 2d 751; *Schenk v. State* (1971), 51 Wis. 2d 600, 606, 187 N. W. 2d 853; 75 Am. Jur. 2d, *Trial,* p. 606, sec. 646. The question then is whether the evidence reasonably required the giving of the entrapment instruction? We are of the opinion that, based upon the evidence submitted in this case, it was entirely proper for the trial court to give both instructions.

The defense of entrapment involves two elements. The defendant must show by a preponderance of the evidence that an inducement to commit the offense occurred. The state must show, beyond a reasonable doubt, that the defendant had a prior disposition to commit the crime. *State v. Boutch, supra; Hawthorne v. State* (1969), 43 Wis. 2d 82, 91, 168 N. W. 2d 85.

The defendant contends that his admission at trial that he initiated the call to Gray for the purpose of selling marijuana to him conclusively disposed of the prior disposition issue in favor of the state.

While it is true that the defendant made this admission, he also testified that following the meeting on March 1, 1973, during which the alleged threats by Gray took place, the defendant abandoned his intention to make the sale. It was the defendant's contention, in support of the

coercion defense, that he only completed the sale because of the fear engendered by Gray's threats of violence.

The evidence of abandoned intent to make the sale, reasonably raised an issue with regard to entrapment such that the instruction could properly have been given.

The defendant further contends that the threats of violence, relied upon to establish the coercion defense, do not meet the framework of the entrapment defense which is concerned with inducements of a passive rather than active nature.

This court has recognized, contrary to the defendant's contention, that entrapment encompasses inducements and other activities by the police which remove the element of volition from the conduct of the defendant. *State v. Hochman* (1957), 2 Wis. 2d 410, 415, 86 N. W. 2d 446. It is generally recognized that entrapment is involved where the police have instigated, induced, lured or incited the commission of the crime and where the tactics of the police offend common concepts of decency. 22 C. J. S., *Criminal Law*, pp. 138–140, sec. 45 (2).

The defendant also argues that it was error to give the instructions sua sponte over objections of counsel, who had determined as a matter of trial strategy not to invoke the defense of entrapment. Hence, claims the defendant, the giving of such an instruction was an act of advocacy by the trial court. We are of the opinion that such is not the case. The instructions given by the trial court did not emphasize any objectionable or prejudicial occurrence.[2] Moreover, this is not a situation where the trial court has taken a partisan stance in the case in the sense denounced by this court in *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120; *Lemerond v. State* (1969), 44 Wis. 2d 158, 170 N. W. 2d 700; and *State v.*

---

[2] *State v. Cassel* (1970), 48 Wis. 2d 619, 180 N. W. 2d 607; *Price v. State* (1967), 37 Wis. 2d 117, 154 N. W. 2d 222.

*Nutley* (1964), 24 Wis. 2d 527, 129 N. W. 2d 155. Indeed, this court has recognized that the trial court is not required to stand idly by, acting as a mere moderator of the proceedings, so long as he does not overtly take a partisan stance in the eyes of the jury. *State v. Davis* (1975), 66 Wis. 2d 636, 225 N. W. 2d 505; *State v. Nutley, supra.* *See also:* ABA Project on Minimum Standards for Criminal Justice: *Standards Relating To Trial By Jury,* p. 110, sec. 4.6, and comments page 115 (suggesting that it is proper for trial court to require instructions on his own motion over the objection of one of the litigants).

Any possible prejudicial effect of the questions of the district attorney directed toward predisposition evidence was obviated by the evidentiary ruling of the trial court. The trial court sustained the objection because at that time it was of the opinion an entrapment instruction would not be given. Also, at the conclusion of the trial, after the trial court had concluded that based upon the evidence presented it could reasonably give an entrapment instruction, it denied the motion of the state to reopen the case to present predisposition testimony.

In the context of this case, we find no reason to believe that giving of both instructions would in any way confuse the jury. An instruction on both coercion and entrapment was neither inherently inconsistent nor impossible to reconcile as was the case in *Stump v. Bennett* (8th Cir. 1968), 398 Fed. 2d 111, certiorari denied, 393 U. S. 1001, 89 Sup. Ct. 483, 21 L. Ed. 2d 466, nor incomprehensible and misleading as in *Buel v. State* (1899), 104 Wis. 132, 80 N. W. 78. Both instructions ultimately required the jury to find the defendant's guilt beyond a reasonable doubt. In fact, the entrapment instruction, which permitted the jury to find for the defendant if they had a reasonable doubt that the threats induced the commission of the crime was more favorable to the defendant than the coercion instruction which required that the jury find for the defendant if there was a reasonable doubt that he

was coerced into committing the crime because of a reasonable belief that no other means of preventing imminent death or great bodily harm was available to him. This is especially so where, as here, nearly three days elapsed between the alleged threats and the eventual sale.

The giving of the entrapment instruction in this case was not reversible error. The facts reasonably raised the defense, the rulings of the trial court denying the admission of the state's evidence on predisposition negated any evidentiary risk; the instruction was generally favorable to the defendant; and it cannot be concluded that the instructions, as a whole, were inherently misleading or inconsistent or confusing to the jury.

### *Prior conduct.*

While in custody, the defendant signed a statement which was subsequently introduced at trial, partially over the objection of counsel for defendant. The statement provided, in relevant portion:

*". . . I want to state that I have been fabricating a big front that I am a dealer. I want to say that this is the first time I have ever dealt. I have been on this scene with David Gray that I have been dealing in heavy quantities in Superior, Stevens Point, at Ladysmith, Wisconsin. I told David Gray that I push or in the last six weeks I have sold 760 pounds. This is what I told David Gray but it's a lie or a falsehood. I also told David Gray I wanted to buy 100,000 hits of speed, which is also a lie. I want to say that I am not a dealer and that that is the only time that I have sold any marijuana.* This is on the 5th of March, 1973, at approximately 11:00 a.m. to David Gray. I readily admit to selling on this one occasion to David Gray. I am afraid of David Gray and I thought he was going to kill me. If the opportunity avails itself I am willing to work off my beef with the man if it will help me. I turned down a deal with David Gray on the Thursday prior to 3–5–73 and I gave David Gray his money back. *I don't know if Gary Froom deals dope or not. He is just a friend of mine. . . ."* (Emphasis supplied.)

The italicized portion of the statement was objected to by the defendant on the basis that it was highly prejudicial and not relevant to the single charge involved in the case; that the prejudicial effect outweighed the probative value; and that the specified portions should not have been admitted.

The state initially contends that the defendant's statement was wholly admissible even if viewed solely as predisposition evidence and even if coercion was the only defense raised by the evidence. The trial court took the position that predisposition evidence was not admissible if coercion was the only issue in the case.

We are of the opinion that the trial court was correct. Coercion is highly analogous to the privilege of self-defense, both of which look to the reasonableness of the actor's belief that his only safe recourse is the commission of a criminal act. Under neither, coercion nor self-defense, is it important that the actor was, at some prior time, predisposed to commit the crime. If the threats are found to have been made so as to reasonably put the actor in fear of death or bodily harm unless he commits the act, the act is privileged, if for no other reason than such reasonable fears override any other inclination. Coercion, unlike entrapment, is a defense limited to the most severe form of inducement. It requires an additional finding, under the objective-reasonable man test, with regard to the reasonableness of the actor's beliefs that he is threatened with immediate death or great bodily harm with no possible escape other than the commission of a criminal act. This additional finding, judged under the reasonable man test, makes the defense available without regard to the defendant's individual predisposition which is assumed to be inoperative.

We are of the further opinion that the trial court did not abuse its discretion in admitting the defendant's statement for the following reasons.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 291, 292, 149 N. W. 2d 557, this court stated the general rule governing

the introduction of evidence of criminal activity other than that charged in the particular case:

". . . It is a maxim in our jurisprudence that all facts having rational or logical probative value are admissible in evidence unless excluded by some specific rule. . . . Likewise, the 'character rule' is universally established that evidence of prior crimes is not admitted in evidence for the purpose of proving general character, criminal propensity or general disposition on the issue of guilt or innocence because such evidence, while having probative value, is not legally or logically relevant to the crime charged. . . ."

Thus, the *Whitty* rule is an exception to the general rule of admissibility. The rule itself contains certain exceptions which were noted by this court to include evidence of other criminal activity to show the elements of the specific crime charged, intent, knowledge, motive, identity, system of criminal activity, to impeach credibility, and to show character where character is put in issue by the defendant. *Whitty v. State, supra,* pages 292, 294.

The objected to portions of the statement concern comments made by the defendant to Gray during the course of negotiations for the sale in question. They constitute both an admission by the defendant that he dealt with Gray and an admission that he lied to Gray. The statement was introduced at the beginning of the trial before Gray's testimony, and was relevant to the issue of whether the defendant participated in the alleged sale to Gray, as well as the issue of the defendant's credibility. The trial court ruled that the entire statement was admissible as relevant and not having a disproportionate prejudicial effect, being essentially a denial, not an admission, of other drug offenses. On motions after verdict, the trial court additionally and properly found that the rule in *Whitty v. State, supra,* did not require exclusion of the objected to portions of the defendant's statement.

While the trial court did not specify which exceptions to the *Whitty* rule applied, it did determine that the gen-

eral exclusionary rule of *Whitty* was not applicable. The *Whitty* rule is based upon a policy of excluding otherwise relevant testimony where the risk that the jury will consider general criminal propensity as indicative of guilt in a particular case is high. In the present case, however, the defendant by his statement and testimony, and under his affirmative defense of coercion, admitted committing the crime. Therefore, as the trial court concluded, the rationale of the *Whitty* exclusionary rule was inapplicable.

In *Whitty v. State, supra,* pages 294, 295, this court additionally required that the trial court determine whether the prejudicial effect of the evidence outweighed its probative value. In view of the fact that the defendant's statement constituted denials of prior criminal conduct and that the defendant confessed to making the sale, the trial court did not abuse its discretion in admitting the statements. The fact that neither party made any specific reference to *Whitty* until motions after verdict is of no consequence.

While the exceptions to the *Whitty* rule are limited-purpose exceptions and a request for a limiting instruction would have been proper and disclosed the precise grounds relied upon by the state, it is not encumbent upon the state to seek a limitation as to its own evidence where no request for a limiting instruction is made by the challenging party. *See, e.g., Seraphine v. Hardiman* (1969), 44 Wis. 2d 60, 67, 170 N. W. 2d 739; Wisconsin Rules of Evidence, sec. 901.06, Stats., effective January 1, 1974.

The defendant also claims that he was denied a fair trial because of other references to his prior dealings.

On cross-examination of the defendant, the district attorney asked several questions relating to whether the defendant had, prior to the sale in question, made other drug sales. The district attorney also referred to the denial made by the defendant in his written statement that he was a regular dealer or pusher of marijuana. Counsel for the defense duly objected to the questions and refer-

ences and moved for a mistrial. In each case the objections were sustained by the trial court, who following a discussion with the parties as to the defense theory of the case, determined that evidentiary rulings would be predicated upon the assumption that the case would only go to the jury on the issue of coercion. The motions for mistrial were denied.

In view of the fact that the rulings of the trial court were favorable to the defense, it cannot meritoriously be argued that the defendant was prejudiced by the trial court's rulings. The motions for mistrial were predicated on the notion that as the objected-to portions of the defendant's written statement were inadmissible and highly prejudicial, any references thereto compounded the error in admitting them. Since we conclude that the trial court did not err in admitting the entire written statement, no grounds for mistrial were presented by the district attorney's references to that statement. Moreover, the trial court, after proper objection was made by counsel for the defendant, ruled that it wanted no more references made to the prior drug dealings of the defendant because of the way in which the case was going to be submitted to the jury.

On closing arguments, the district attorney stated that the defendant was a dealer in marijuana and referred to him as a pusher. The defense's objection was overruled. Further objections during argument were cut off by the trial court. The district attorney again referred to the defendant as a pusher. Counsel for the defense, after the jury retired, moved for a mistrial on account of the references to the defendant as a pusher. The motion was denied on the basis that the court had instructed the jury as to the proper function of the arguments of counsel which covered the problem.

The defendant contends that these remarks by the district attorney exhumed all the previous material which related to the prior conduct of the defendant and served

to emphasize that factor in the minds of the jury so as to preclude the defendant from receiving a fair trial. We do not agree.

The trial court did not permit any direct evidence of prior criminal activity by the defendant to be admitted. Defendant's statement, which was admitted in its entirety, contained no such direct evidence, but rather contained only denials of such activity. The questions of the district attorney upon cross-examination of the defendant which were objected to by counsel for the defense were not permitted by the trial court.

The defendant denied knowing where to obtain marijuana to sell to Gray. Gray, on the other hand, testified that the defendant, even after he alleged Gray had made threats, continued to offer large quantities of marijuana and other drugs to Gray for sale. The defendant's explanation as to why the hitchhikers brought him Gray's note in the first instance, as to why he did not seek the aid of the police when faced by Gray's alleged threats and as to how he procured the marijuana which he sold to Gray, raised a substantial issue of credibility and an issue as to the existence of the alleged threats as well as the reasonableness of the defendant's asserted belief that he had no reasonable means of escaping death or serious bodily harm other than making the sale. The remarks of the district attorney constituted a fair comment on the evidence and were relevant to the issues of credibility and the defense of coercion, and did not deny the defendant a fair trial in view of the specific instruction to the jury as to the proper consideration to be given the arguments of counsel.

### Larsen's report.

On September 5, 1973, almost a month after the trial, counsel for the defense received from the district attorney's office a copy of a surveillance report filed in the

case by Officer Larsen of the campus security office. The defendant contends that the report indicates specific facts which discredit the testimony of Gray and that failure to disclose the report when proper request was made prior to trial denied the defendant of due process under the mandate of *Brady v. Maryland* (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215.

Security officer Larsen was called in this case to testify on behalf of the defendant. In so doing, he related every significant fact contained in his report except two. He did not testify that he observed the defendant and Gray re-enter the Union on March 1, 1973, following their trip to Duluth as contained in his report. In addition, he did not testify that Officer Gravesen of the Superior police department had requested the assistance of the security police in the surveillance activities.

Gray, at one point, testified that he did not re-enter the Union with the defendant after the trip to Duluth, but later testified that he could not remember. Officer Gravesen's testimony with regard to contacting the campus security police for assistance was that they invited the security people to assist them as a matter of courtesy. Larsen's report did not contradict either the testimony of Gray or Gravesen and, therefore, was not clearly exculpatory. *See: Lampkins v. State* (1971), 51 Wis. 2d 564, 575, 187 N. W. 2d 164.

More importantly, this court has held that due process is not violated under *Brady v. Maryland, supra,* unless the information in question is within the exclusive possession and control of the authorities. *State v. Calhoun* (1975), 67 Wis. 2d 204, 214, 226 N. W. 2d 504; *Mikulovsky v. State* (1972), 54 Wis. 2d 699, 196 N. W. 2d 748; *Lampkins v. State, supra,* page 575.

Clearly, where Larsen was called as a witness for the defense it cannot be meritoriously contended that the information contained in his report was within the exclusive possession and control of the state. As this court

held in *State v. Calhoun, supra,* page 216, exclusive control will not be presumed where the witness is available to the defense and the record fails to disclose an excuse or reason for the failure to question the witness.

### *Money found on the defendant.*

Over an objection by counsel for the defendant, the trial court permitted into evidence a statement that when the defendant was arrested eleven days after the sale he possessed $901.40 in cash.

In *State v. Heidelbach* (1971), 49 Wis. 2d 350, 182 N. W. 2d 497, this court dealt at some length with the rules governing the introduction of evidence of expenditures after an alleged crime as circumstantial evidence that the defendant committed the crime. This court concluded that the evidence was relevant and admissible without laying a foundation of prior relative impecuniousness and that the weight of the evidence was for the trier of fact. *State v. Heidelbach, supra,* page 359. The liberal rule of admissibility was thought to be consistent with the liberal rule as to the admissibility of circumstantial evidence in criminal cases generally. *State v. Heidelbach, supra,* page 357.

The defendant contends that the *Heidelbach Case* is distinguishable in that burglary was there involved which makes the possession of money shortly after the offense of particular probative value. In the present case, the sale to Gray involved $165, and the defendant testified that it cost him $160 to purchase the marijuana which he sold to Gray. In addition, emphasis is placed upon the fact that unlike in the *Heidelbach Case,* the defendant's arrest was not contemporaneous with the offense and that on balance the slight probative value of the circumstantial evidence is outweighed by the prejudicial effect of the evidence. *See, e.g.: Whitty v. State, supra; Miller v. State* (1972), 53 Wis. 2d 358, 192 N. W. 2d 921.

The record reflects that the defendant gave an explanation as to how he obtained the money, referring to such sources as income tax refund, employment and other sources. This testimony was not in any way contradicted or disputed.

Viewing the record as a whole, the defendant was not prejudiced by admission of this evidence, and its admission was harmless error.

### *Tapes of conversation.*

The defendant asks that the action be dismissed or a new trial granted because of the destruction of certain tapes of the March 1, 1973, conversation at the Union between the defendant, Gray and Prettie. This is one of the occasions when the defendant alleges that Gray made threats of physical harm to the defendant. Throughout the trial, Gray consistently denied that he ever threatened the defendant.

There are certain undisputed facts. The university security officers were contacted by the Superior police as a matter of courtesy. Gray had a monitoring device attached to his person, and such a device was also given to the University Security Officer Sandmon to monitor the conversation while in the Union on the night of March 1st. Sandmon, without any authorization from the Superior police or Gray, undertook to tape the conversation received on the monitoring device by placing a cassette tape recorder near the monitoring device. Gray did not know about Sandmon's attempt to tape the conversation, but he did know the conversations were being monitored. Sandmon did not hear Gray make any threats on the monitor. In May, at the end of the school semester, Larsen, the chief security officer at the university, bulk-erased all of the tapes in his desk drawer so they would be available for reuse. At the time, no one had authorized Larsen and Sandmon to erase the tapes. The district at-

torney learned that the tape recordings had been made and subsequently erased shortly before trial. He immediately notified defense counsel of the facts and had Sandmon prepare a summary of the contents of the tapes which he had tried to listen to shortly after they were made. Larsen and Sandmon were the only persons who had ever listened to the tapes. Both testified that the tape was of poor quality, practically unintelligible, and that because of static and background noise, only bits and pieces of the conversation were understandable. Larsen was not present during the entire replay of the tape as he was called out of his office during the replay. Neither heard Gray make any threats to the defendant.

The evidence is equivocal as to whether Officer Gravesen of the Superior police department knew the tape was made. Larsen testified he may have told Gravesen about it. Gravesen testified he was not aware the tape had been made and did not remember Larsen telling him about it.

On motions after verdict, and on this record, the trial court found that the tapes were practically unintelligible; that the erasure was inadvertent; and that even if the tapes were intelligible, they would not probably have aided the defendant's case because it was very unlikely that Gray would have made any direct threats when he knew his conversations were being monitored. As such, the trial court concluded that the defendant had not been denied a fair trial.

It is conceded that neither the fact that the tapes were made and retained by the campus security police, rather than the Superior police, nor the fact that the district attorney was unaware of the existence of the tapes prior to their destruction, affects the duty of the district attorney to obtain all relevant evidence in the possession of the investigatory agencies of the state. *Wold v. State* (1973), 57 Wis. 2d 344, 204 N. W. 2d 482. On the other hand, such facts do bear on the degree of good or bad faith in the destruction of the evidence.

The rule is well recognized that *suppression* by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or innocence, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland, supra,* page 87; *Nelson v. State* (1973), 59 Wis. 2d 474, 479, 208 N. W. 2d 410; *Britton v. State* (1969), 44 Wis. 2d 109, 118, 170 N. W. 2d 785. The evidence so suppressed must be exculpatory. *Lampkins v. State, supra,* pages 575, 576. Even where the evidence is material to guilt or innocence and exculpatory, a new trial is only required where the evidence would in reasonable likelihood have altered the result. *State v. Calhoun, supra,* page 215; *Nelson v. State, supra,* page 486. Thus, in a *suppression* case, the good faith or bad faith of the prosecutor is not alone decisive, and because the evidence is readily available for inspection by the court, the primary concerns are materiality and the exculpatory nature of the evidence as limited by the doctrine of harmless error.

The issue of whether, in an evidence *destruction* case, the defendant must show that the evidence was exculpatory was raised in *United States v. Bryant* (D. C. Cir. 1971), 439 Fed. 2d 642, and resolved in an eminently reasonable fashion. That case also involved a narcotics' sale and a tape of the conversation between defendants and a narcotics' agent which was destroyed prior to trial. Under the circumstances of that case, the defendants' involvement in the drug sale could only be established by proof of what was said during the taped conversation and the agent's testimony was the key to the government's case. The circuit court reasoned that if the defendants were required to show that the destroyed tape was exculpatory—an impossible task—the prosecution could easily subvert the purpose of the *Brady Case* by destroying rather than suppressing exculpatory evidence:

". . . Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials was

known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal. . . ." *United States v. Bryant, supra,* page 648.

We find the reasoning of the circuit court in *United States v. Bryant, supra,* persuasive. It is concluded, therefore, that the inability of the defendant to show that the destroyed evidence was exculpatory does not alone defeat the claim that its destruction and nondisclosure by the prosecution denied the defendant due process of law given the showing that the evidence was clearly material to the issue of guilt or innocence.

The *Bryant Case* introduced the consideration of bad faith on the part of the prosecution in relying on the rationale that destruction of evidence might be used as a tool to circumvent the *Brady* suppression rule. In the *Brady Case,* a violation of due process was found irrespective of good or bad faith. In holding that the degree of good or bad faith by the prosecution can be considered in the determination of whether a sanction should be imposed in an evidence destruction case, the circuit court in the *Bryant Case* relied upon *United States v. Augenblick* (1969), 393 U. S. 348, 89 Sup. Ct. 528, 21 L. Ed. 2d 537.

The *Augenblick Case* involved a collateral attack by two sailors to their court martial convictions. The evidence destroyed in that case were tapes of the interrogation of the defendants by naval personnel. In holding that the defendants' constitutional rights had not been violated, the supreme court noted that the tapes had not been "suppressed," presumably meaning in bad faith, as the record established that the Navy had made an "earnest effort" to locate the tapes and had a routine method of handling and using such recordings, despite the fact that the ultimate fate of the tapes remained a mystery. *United States v. Augenblick, supra,* pages 355, 356. *See also: Killian v. United States* (1961), 368 U. S. 231, 82

Sup. Ct. 302, 7 L. Ed. 2d 256, rehearing denied, 368 U. S. 979, 82 Sup. Ct. 476, 7 L. Ed. 2d 441. (Interim notes taken to transfer data to final written report destroyed in good faith in accord with normal practice shows no violation of defendant's rights to due process.)

On the other hand, some courts when faced with an issue with regard to destruction of evidence material to the defense have followed the strict suppression case rule that the good or bad faith of the prosecution has no bearing on whether the defendant has been denied due process of the law. *See, e.g.: United States v. Heath* (D. C. Hawaii 1957), 147 Fed. Supp. 877, appeal dismissed (9th Cir. 1958), 260 Fed. 2d 623; *Trimble v. State* (1965), 75 N. M. 183, 402 Pac. 2d 162.[3]

The *Augenblick* and *Killian Cases* reflect that the good or bad faith of the prosecutor is a factor to be considered within the constitutional framework of whether an item of evidence has been "suppressed" by its destruction. Moreover, in an individual case, the good or bad faith of the state in destroying the evidence could reflect on the value and importance of the evidence. The burden of producing the evidence or of explaining why it could not do so, falls on the government. *United States v. Augenblick, supra,* page 355. This is consistent with this court's holding in *Wold v. State, supra,* which places on the prosecution the duty of obtaining all evidence subject to disclosure in the possession of the state's investigatory agencies of which the prosecution has knowledge, or by the exercise of due diligence, should have discovered.

In the *Bryant Case* the court determined that the case before it should be remanded for a further evidentiary hearing to provide a more suitable factual background for making the determination of whether the sanction of dismissal was warranted. The circuit court directed that

---

[3] *See: Judicial Response to Governmental Loss or Destruction of Evidence,* 39 Univ. of Chicago Law Rev. (1972), 542.

the lower court take into consideration the degree of negligence or bad faith by the government, the importance of the evidence lost, and the other evidence of guilt adduced at trial. *United States v. Bryant, supra,* page 653.

Upon remand, the lower court in *Bryant* affirmed the conviction. A second appeal was taken to the circuit court. *United States v. Bryant* (D. C. Cir. 1971), 448 Fed. 2d 1182. The circuit court noted that the lower court determined the destruction of the evidence was in direct violation of the agency's regulations governing preservation of such evidence. However, based on the lower court's finding that the tapes were wholly unintelligible and that there was strong evidence of guilt adduced at the trial, the conviction was permitted to stand. *United States v. Bryant* (D. C. Cir. 1971), 448 Fed. 2d, *supra,* page 1184.

The trial court in the present case followed the procedure outlined by the circuit court in the *Bryant Case* in all regards except making a finding as to the strength of the evidence of guilt adduced at the trial. Following the rationale of the *Bryant Case,* we conclude that the findings of the trial court were not against the great weight and clear preponderance of the evidence. Furthermore, the evidence of guilt in the record weighs in favor of permitting the conviction to stand. The coercion defense, even assuming the alleged threats were made, was of marginal application because of the intervening three days between the alleged threats and the actual sale. The entrapment defense, which the defendant disavowed, while reasonably raised by the evidence, was not strong in view of the admitted initial contact by the defendant.

*By the Court.*—Judgment and order affirmed.