Tommy K. McINTURFF, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-76-25.

Court of Criminal Appeals of Oklahoma.

Sept. 17, 1976.

Kienzle, Jay, Clifton & Shallcross, Shawnee, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Kenneth Lisle, Legal Intern, for appellee.

OPINION

BLISS, Judge.

The Appellant, Tommy K. McInturff, hereinafter referred to as defendant, was charged, tried before a jury and convicted of the crime of Unlawful Delivery of Marihuana in the District Court of Pottawatomie County, Case No. CRF-74-569. Punishment was assessed at a term of two (2) years in the custody and control of the Department of Corrections of the State of Oklahoma and a fine of Five Hundred Dollars ($500.00). From a judgment and sentence in conformance with the verdict, the defendant has perfected his timely appeal.

Briefly stated, the evidence adduced at trial is as follows, to-wit: Dennis Dill, an undercover narcotic's agent, testified that

at approximately 10:00 P.M. on the evening of November 30, 1974, he went to the defendant's home in Shawnee accompanied by the defendant's cousin, Buddy McInturff. After watching television for a short while, Dill asked the defendant if he had a bag of marihuana for sale and the defendant replied, "Yes; it's out in the garage; we'll have to get it." Then they went into the garage where the defendant removed two baggies of a green leafy substance from the trunk of his vehicle, one of which was purchased by Dill for $10.00. The three then got into Dill's car and went to the apartment of Keith Tucker. The defendant stayed until approximately 1:00 A.M. and then left and met Investigator Dan Megehee, delivering the bag of green leafy substance to him. On cross-examination Dill admitted that while they were at Tucker's apartment one "joint" had been rolled out of the contents of the bag. He further stated that he had been "running around" with Buddy McInturff for approximately six and a half weeks and that when they first met Dill was employed by the local District Attorney to make undercover narcotics' buys. He further stated that he had worked in numerous other areas of the state as an undercover agent and had been on occasion paid each time he made a buy. He further stated that prior to becoming an investigator he had used marihuana and LSD; that prior to the night in question he had shared marihuana with Buddy McInturff and others from purchases he made and later turned in to law enforcement officers; that he was 20 years of age and that the defendant and his cousin were 17 or 18. He further stated that he had purchased some beer for Buddy McInturff and a friend but denied ever furnishing marihuana to others from his own personal supply and further denied having a personal supply in the home of Ms. Kitchens. He further admitted subsequently arresting the defendant by giving him an envelope containing a card which read, "You are under arrest", and then pulling a .38 caliber revolver and placing the defendant under arrest. Under redirect examination the witness stated that after making purchases it was sometimes necessary to smoke with others some of the purchased marihuana in order to preserve his undercover identity.

Dan Megehee, investigator for the Pottawatomie County District Attorney, then testified that he met with Dennis Dill during the early morning hours of December 1, 1974, at which time Dill delivered a bag of marihuana. The bag was then identified as State's Exhibit No. 1. Megehee stated that he took the bag to the Oklahoma State Bureau of Investigation laboratory on December 5th in a large brown envelope, State's Exhibit No. 2. Both Exhibits revealed identifying marks made by Megehee. On cross-examination the witness stated that when Dill first started to work as an undercover agent in Pottawatomie County he was searched on 8 or 10 occasions prior to going out and making buys and that the searches were made to establish Dill's character. After about three weeks, he was no longer searched since his character as a qualified agent was established.

Mike McGeehon, a forensic chemist for the Oklahoma State Bureau of Investigation, then testified that he analyzed the contents of State's Exhibit No. 1 and that the results of his test indicated that the substance was marihuana. The State then rested.

The defense then called Buddy McInturff who testified that he was 17 years of age and was a cousin of the defendant. He further stated that on numerous occasions he and Dennis Dill had smoked marihuana and drunk beer which had been furnished by Dill. On approximately three occasions they had been to the apartment of a Ms. Kitchen to smoke marihuana and that Dill had dried out moist marihuana in the oven. He further stated that Dill had once furnished a large "party joint" which he, Dill and some others shared. On the evening in question, Dill picked him up and they went to a party at the apartment of

Keith Tucker.. No one was smoking marihuana. Later that evening Dill asked Tucker to call the defendant to see if he had any marihuana for sale. After the call the witness accompanied Dill to the defendant's house and asked his cousin for some marihuana which was delivered to Dill in exchange for $10.00. The witness, the defendant and Dill then returned to the Tucker apartment, smoking a joint made from the purchased marihuana on the way. Later that evening the witness observed Dill smoking marihuana with some girls who had been at the party. McInturff then examined State's Exhibit No. 1 and stated that it did not resemble the marihuana which Dill had purchased on the night in question. On cross-examination Buddy testified that he had introduced Dill to the defendant approximately two weeks before the day in question and that a few days later they were again together riding around, drinking beer and smoking pot and that these were the only occasions that he personally knew of that Dill and the defendant were together.

The defense called Debbie Wallace who testified that she was 15 years old, that she attended the party at Keith Tucker's apartment, that she recalled Dill and Buddy McInturff leaving the party and that up until their return there had been no marihuana smoking at the party. After the party broke up Dill took the witness and her sister home. On the way, Dill asked them if they wanted to go smoking and they agreed. They smoked three or four "joints" and then Dill took them home. On cross-examination the witness stated that she was present when Keith Tucker called the defendant seeking marihuana and that Buddy McInturff and Dill then left to get the marihuana after Tucker said the defendant had some for them.

Keith Tucker then testified as a defense witness stating that he met Dill about three or four weeks prior to the date in question and that on one occasion he smoked marihuana provided by Dill and on another oc-casion Dill offered to take Tucker and his girl friend smoking but they refused. He further stated that on the evening in question, Dill and Buddy McInturff came to a party at his apartment, that he called the defendant at Dill's request concerning the possibility of purchasing some marihuana, that Dill was smoking marihuana prior to the call to the defendant and that when Dill returned with the defendant he provided marihuana to some of those at the party. On cross-examination Tucker stated that he never observed the defendant in Dill's presence other than at the party. Tucker further stated that he told the defendant over the phone that Buddy McInturff and Dill were on their way and the defendant said, "okay".

The last defense witness was Sharon Kitchen, who testified that Buddy McInturff, Dill and some other individuals smoked marihuana and drank beer at her apartment on numerous occasions during October and November. She further testified that on one occasion Dill left some marihuana in her apartment and that every time she saw marihuana in the apartment Dill was the one that had it. She further stated that she finally had to run Dill out of her apartment. On cross-examination Ms. Kitchen testified that the defendant was not among the individuals that came into her apartment with Dill and she had never seen them together. On re-direct examination the witness stated that in the latter part of November or early December Dill told her he was an undercover agent and stated to her that in that capacity he could "still smoke, go out and have fun and then bust people". She further stated that his remark was made prior to the raids. The defense then rested.

The defendant contends, in his second assignment of error, that the trial court committed reversible error by refusing to instruct the jury that the State must prove beyond a reasonable doubt that the defendant was not entrapped. The defendant's proffered instruction was refused and

the following instruction was submitted to the jury:

"The defendant, as one of his defenses herein, has pled entrapment. In this connection you are instructed that one who is instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing may avail himself of the defense of 'entrapment.' Therefore, if you find the defendant was induced or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing; then in that event, it will be your duty to hold for the defendant and acquit him. Such defense is not available, however, where the officer or other person acted in good faith for the purpose of discovering or detecting a crime and merely furnished the opportunity for the commission thereof by one who had the requisite criminal intent. In other words, an officer may make himself available to one who intends to commit a crime."

The defendant asserts that the language in this instruction, in regard to the issue of entrapment, does not clearly place the burden upon the State. He argues that the jury might possibly have determined, from the language of the instruction, that the burden of proof was upon the defendant.

Before proceeding further we feel that it is necessary to establish a predicate for this discussion with a brief analysis of the procedural aspects of the defense of entrapment. In *Notaro v. U. S.*, 363 F.2d 169 (9th Cir. 1966), the following analysis was made as to the allocation of the burden of proof for the defense of entrapment:

"... In *United States v. Sherman*, 200 F.2d 880 (2d Cir. 1952), it was written by Judge Learned Hand, '[I]n such cases two questions of fact arise: (1) did the agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready

and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it.' 200 F.2d at 882–883. This language created uncertainty because the word 'induce' in number (1) of Judge Hand's 'two questions of fact' might be mistakenly equated with 'entrap'.

... In *Sherman v. United States,* supra, the Supreme Court held that the defense of entrapment had been established as a matter of law, although the defendant did not testify and did not in one sense, 'come forward' with any evidence which bore upon the defense. In another sense, he did 'come forward' in that, by cross-examination of government witnesses, he established that the crime was 'induced', although the determination of the ultimate conclusion as to whether there was 'entrapment' remained for the Court. *Therefore, it seems quite clear that when it can be said that the issue of entrapment has fairly arisen, whether by testimony given during the presentation of the prosecution's case in chief or by testimony offered in defense, the defendant has met whatever 'burden' rests upon him.* (emphasis added)

... ■ The duty of determining whether or not the issue exists is the judge's duty, not the jury's, and if the issue exists and the determination of the ultimate question of entrapment is submitted to the jury, 'it is better [that the instructions not] speak in terms of the defendant having [any burden whatsoever].' *Johnson v. United States,* 115 U. S.App.D.C. 63, 317 F.2d 127, 129 (1963). The issue having appeared, it becomes the prosecution's burden to establish beyond a reasonable doubt that the accused was not entrapped into the commission of the offense. ..."

As can be seen from the foregoing language, the defendant must first raise, by sufficient evidence, the defense of entrapment. Then, the burden of proof rests on

the State to prove beyond a reasonable doubt that the defendant was "ready and willing without persuasion and was . . . awaiting any propitious opportunity to commit the offense". This view obviously represents the great weight of authority.[1]

From a review of the cases presented by the State and the defendant it is apparent that the present status of our law on this issue is somewhat inconsistent. In *Watson v. State,* Okl.Cr., 382 P.2d 449 (1962), and *Robinson v. State,* Okl.Cr., 507 P.2d 1296 (1973), we maintained the position that the State did not have the burden of proving beyond a reasonable doubt that the defendant was not entrapped. However, the exact opposite position was taken in *Striplin v. State,* Okl.Cr., 499 P.2d 446 (1972), and *Robertson v. State,* Okl.Cr., 521 P.2d 1401 (1974), where we held that the State must prove beyond a reasonable doubt that the defendant was not entrapped. We are now of the opinion that the latter view, which is in substantial conformity with the great majority of jurisdictions which have ruled on this issue, is the better position. Therefore, the position previously stated in *Watson v. State,* supra, and *Robinson v. State,* supra, is hereby, overruled.

Based on the foregoing, we are of the opinion that the trial court's refusal to instruct the jury as the defendant requested was prejudicial error. The instructions actually submitted to the jury, hereinbefore set forth, did not properly allocate the burden of proof.

█ The trial court, having determined that the evidence was sufficient to warrant an instruction on the defense of entrap-

ment, should have instructed the jury that they must have found, before returning a verdict of guilty, that the State had proven beyond a reasonable doubt that the defendant had not been entrapped, i. e., that the defendant had a predisposition to commit the crime charged. Where it is clear from the instruction given that the jury could not have properly allocated the burden of proof to the respective parties, the conviction must be reversed. In *Notaro v. U. S.,* supra, the Court stated:

"It will be seen also that under the questionable instruction, the jury was not permitted to acquit the accused unless it *'should find* from the evidence' that there existed the necessary elements of the defense. (Emphasis added) This was improper, since in requiring that the jury 'should find' certain facts, the existence of which were made indispensable to acquittal, a definite, conclusive, determination of disputed factual issues was required of the jury as a condition to acquittal. Such a requirement was erroneously imposed. The appellant was indeed entitled to acquittal if the jury 'should find' that he 'had no previous intent or purpose to commit' the . . . offense 'and did so only because he was induced or persuaded by some agent of the Government'. But he was also entitled to be acquitted if, from the evidence, the jury, because of the entertainment of reasonable doubt, should be unable to 'find' that the necessary elements of the defense had not been excluded.

In reaching our conclusion, we have been mindful of obligation to consider the instructions in their entirety. The

---

1. This position has been asserted by the following jurisdictions: 1st Cir.Ct.App. (*Walker v. U. S.,* 344 F.2d 795) ; 3rd Cir.Ct.App. (*U. S. v. Watson,* 489 F.2d 504) ; 5th Cir.Ct. App. (*U. S. v. Mosley,* 496 F.2d 1012) ; 6th Cir.Ct.App. (*U. S. v. Eddings,* 478 F.2d 67) ; 7th Cir.Ct.App. (*U. S. v. Landry,* 257 F.2d 425) ; 9th Cir.Ct.App. (*U. S. v. Glassel,* 488 F.2d 143) ; 10th Cir.Ct.App. (*Martinez v. U. S.,* 373 F.2d 810) ; (*State v. McKinney,* 108 Ariz. 436, 501 P.2d 378) ; (*Zinn v. State,* 134 Ga.App. 51, 213 S.E.2d 156) ; (*People v. Cooper,* 17 Ill.App.3d 934, 308 N.E.2d 815) ; (*Smith v. State,* 258 Ind. 415, 281 N.E.2d 803) ; (*People v. Habel,* 50 Mich. App. 630, 213 N.W.2d 822) ; *Minnesota* (*State v. Grilli,* 230 N.W.2d 445) ; Mississippi (*Alston v. State,* 258 So.2d 436) ; Missouri App. (*State v. Weinzerl,* 495 S.W.2d 137) ; and Wisconsin (*State v. Amundson,* 230 N.W.2d 775).

jury was properly informed, in a general instruction, as to the burden of proof which rested upon the prosecution; however, we cannot assume that it carried the advice of the general instruction into application to the instruction emphasizing the specific elements of the defense. The possibility that there was confusion or misunderstanding is strengthened, not eliminated, by view of the instructions as a whole." (Footnote omitted)

In accord with the foregoing discussion, this conviction is *REVERSED AND RE-MANDED* for a new trial.

BRETT, P. J., and BUSSEY, J., concur.