STATE of Wisconsin, Plaintiff-Appellant,

v.

Raymond R. EHLEN, Defendant-Respondent-Petitioner.

Supreme Court

No. 82–217–CR. *Argued September 9, 1983.—*
*Decided June 27, 1984.*

(Also reported in 351 N.W.2d 503.)

For the defendant-respondent-petitioner there were briefs and oral argument by *Steven P. Weiss,* assistant state public defender.

For the plaintiff-appellant the cause was argued by *Jerome S. Schmidt,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, C.J. This is a review[1] of an unpublished decision of the court of appeals, dated December 27, 1982, which reversed a suppression order of the circuit court for Kenosha county, William U. Zievers, Judge. The issue in this case is whether the destruction of Raymond R. Ehlen's blood sample necessitates suppression of the blood test results.[2] The court of appeals held that, because the defendant failed to show the materiality of the blood sample at the point of its destruction, under *State v. Booth,* 98 Wis. 2d 20, 295 N.W.2d 194 (Ct. App. 1980), suppression of the blood test results was not appropriate.

The defendant challenges the court of appeals decision, which reversed the trial court's suppression order, on three grounds: (1) That the court failed to consider the statutory basis upon which the trial court could have suppressed the test results for failure of the state to comply with secs. 971.23(4) and (5), Stats.; (2) that the court of appeals also failed to consider the discretionary basis for suppression; and (3) that the court's analysis of the destruction in terms of the "materiality" of the blood sample was incorrect. We affirm the court of appeals.

We affirm because the blood sample is not evidence intended, required, or even susceptible of being produced by the state under the provisions of sec. 971.23(4) and (5), Stats. Only the results of the tests will be offered in evidence, and these are mandatorily admissible. Sec. 343.-305(7), Stats. Hence, the provisions of that statute do not apply to a blood sample, because due process is afforded, not only by the statutory right to have access to test reports prior to trial, but, more important, the statutes afford a defendant the right to an additional blood

---

[1] This opinion is of even date with *State v. Walstad* and *State v. Disch* and is governed by those cases.

[2] The blood sample was destroyed by the hospital which conducted the tests, following the testing procedure, and according to routine hospital practice. There is no evidence that the state directed the hospital to destroy the sample.

test at the time of arrest. Most important, however, the defendant is afforded the whole panoply of due-process protections at trial: The right to cross-examine witnesses and experts for the state, the right to impeach by use of the separate blood or breath analysis results, and the right to attack the credibility of the state's witnesses.

The importance of the production of the original breath ampoule or a portion of the blood sample as the *sine qua non* of due process is a myth that should not be perpetuated. The result of the test of the blood sample taken of Raymond R. Ehlen is admissible under the statutes. The production, or nonproduction, of the residue of the blood sample taken from his person at the time of his arrest is irrelevant to whether the results of the test administered by the state are to be admitted in evidence.

On June 27, 1981, the defendant, Raymond R. Ehlen, was involved in an accident which occurred in Kenosha county. Ehlen was operating a station wagon, which he apparently drove into the path of Mark A. Fliess, who was operating a motorcycle. Fliess was killed in the collision. The Kenosha county deputy who assisted the defendant from his car testified that he smelled a strong odor of intoxicants on Ehlen's breath, observed that his eyes were bloodshot, and that he appeared to be disoriented. After Ehlen was transported to St. Catherine's Hospital in Kenosha, the deputy requested that a blood sample be taken. Dr. John Sanson performed the analysis of the defendant's blood sample two days after it had been withdrawn, and the analysis revealed a .233 percent alcohol concentration in the defendant's blood. A criminal complaint was filed on July 14, 1981, charging the defendant with causing the death of Mark A. Fliess by negligent operation of a vehicle while under the influence of an intoxicant, contrary to sec. 940.09, Stats. At the August 25 continuation of the preliminary hearing, Dr. Sanson testified that the sample had been destroyed, ac-

454

cording to standard hospital procedures, two to seven days following the analysis. On August 27, 1981, an information was filed. The defendant filed a motion for discovery of the blood sample on September 4, 1981, or, alternatively, if the state were unable to comply, a motion for suppression of the blood test results.

A suppression hearing was not conducted. Therefore, the only record before us consists of the preliminary hearing. A review of the testimony offered at the July 29, 1981, preliminary hearing reveals the following information. The state elicited testimony from the medical technician who drew the blood that, after she had completed drawing the sample and labeling the tube containing the sample with the defendant's name, his patient number, and the date, she dipped the top portion of the tube into hot paraffin. She then placed the tube containing the sample into a refrigerator. At the August 25 continuation, the state elicited testimony from the pathologist who tested the blood that he received the sealed tube bearing the defendant's name two days after it had been drawn. The doctor stated that he removed the plasma from the sample and transferred the plasma into a shielded plastic capsule containing a reagent, which was placed into a machine that tests for blood alcohol. Dr. Sanson further testified that he also used water as a control, in addition to two other controls, one which routinely gives a reading equivalent to one hundred milligram percent plus or minus two percent, or .10 percent blood alcohol, and one which gives a reading of two hundred milligram percent plus or minus two percent, or .20 percent blood alcohol. As a result of these readings, the doctor testified that he was able to conclude that the machine that he used for the analysis was in proper working order. He further indicated that the defendant's sample yielded a reading of .233 percent blood alcohol.[3] The doctor stated that, be-

[3] Section 940.09, Stats., refers to operation while under the influence of an intoxicant. Section 346.63(4), 1979-80, defines

cause the tube containing the defendant's blood was sealed with paraffin, the delay of two days between the time of withdrawal and the time of testing should "hardly have any effect" upon the resulting blood alcohol reading. If the delay did have any significant effect, he stated that it would lower the blood alcohol reading.

The defendant, during cross-examination, produced testimony from the doctor that the vial containing the defendant's blood had been discarded, according to routine hospital procedure, two to seven days after the test was performed. The pathologist also testified that the machine which he utilized for the testing had been approved by both the State of Wisconsin and the American College of Pathologists following review of routine readings with standardized controls.

The defendant was bound over for trial at the conclusion of the preliminary hearing. The trial court granted the defendant's motion to suppress the blood test results, relying upon the case of *State v. Amundson,* 69 Wis. 2d 554, 230 N.W.2d 775 (1975). The trial judge stated that, because intoxication is an element of the offense for which the defendant was charged, the blood sample was unquestionably material to the guilt or innocence of the defendant.

The court of appeals reversed the suppression order, stating that the sole issue raised by the appeal is whether the destruction of the blood sample deprived the defendant of his due process rights. The court referred to *State v. Booth,* 98 Wis. 2d 20, 295 N.W.2d 194 (Ct. App. 1980). The court of appeals correctly identified the crucial issue, and that point is whether the defendant was denied his due process rights. *Booth* correctly stands for this proposition. Where *Booth* erred—as we pointed out

operating under the influence of an intoxicant as, "A person whose blood contains 0.1% or more by weight of alcohol . . ." This is the statute which was in effect at the time that the defendant was charged under sec. 940.09.

in *State v. Walstad,* 119 Wis. 2d 483, 381 N.W.2d 469 (1984), and *State v. Disch,* 119 Wis. 2d 461, 351 N.W.2d 492 (1984), of even date herewith—is in its belief that the *retention* of an ampoule or a blood sample was relevant to due process or, to state the question alternatively, whether a fair trial could not be had if the blood test results were introduced unless the ampoule or blood sample was produced for retesting. We held, on the basis of the records in *Walstad* and *Disch,* that the retention of a breath ampoule or of a blood sample was of miniscule importance in the assurance of a fair trial when weighed in the balance against the traditional rights of defendants in criminal or quasi-criminal proceedings. Due process—the *sine qua non* of a fair trial—may be assured and, by our constitution and statutes, is assured quite apart from any questions about the materiality of the blood test sample or of a breathalyzer ampoule.

The court of appeals found that the blood sample, even if produced, would not have been material. It accordingly reversed the trial court's suppression order. In that ultimate conclusion, it was correct. The blood test results, for the reasons stated in *Walstad* and *Disch,* are admissible in evidence. Due process safeguards are available, as we set forth in those cases, to attack the authenticity of the tests and the credibility of expert witnesses.

The proceedings at the preliminary hearing recounted above exemplify the factual basis which must be established by the prosecution if due process is to be assured. The preliminary examination, *prima facie* at least, revealed the circumstances of the arrest and the facts that established probable cause for the arrest. There was extensive testimony in respect to the taking of the blood sample and the procedures used for testing, including the procedures utilized by the pathologist who performed the tests to assure that false readings were not obtained.

All of these assertions of the state's witnesses may be again subject to scrutiny at trial. All the mechanisms of due process or fair trial, cross-examination, production and confrontation of witnesses, credibility, and the offer of counter-evidence can then come into play. It is error to so minimize these great tools of the common law as to conclude due process will be violated if a blood test is not suppressed merely because a portion of the sample—even if it were retestable—could not be produced for further tests.

Again, it must be emphasized, the blood test statutes and the implied consent law have their internal safeguards of due process—the right to demand and to receive an additional or alternate type of an alcohol test. The duties of law enforcement officers in respect to guaranteeing the statutory safeguards is set forth in *State v. Walstad.* We are not obliged in this case to determine sanctions that may be applied in the event that, in the future, proper admonitions are not given to a suspected intoxicated driver.

We conclude the court of appeals was correct in its holding, though not in its rationale, that the trial court erred when it suppressed the blood test results. We accordingly affirm its decision, and the order suppressing the blood test results is reversed. The cause is remanded for trial or other proceedings that are now appropriate.

*By the Court.*—Decision affirmed, and cause remanded to the circuit court for further proceedings.

SHIRLEY S. ABRAHAMSON, J. (concurring). I concur for the reasons set forth in my concurring opinion in *State v. Disch,* 119 Wis. 2d 461, 351 N.W.2d 492 (1984), also decided today.

WILLIAM A. BABLITCH, J. (concurring). I agree with the majority that the test results should not be sup-

pressed in this case. However, I write because I would impose an affirmative duty on the state, in the future, to preserve blood samples that are material to the defendant's innocence or guilt. I believe that such a duty is consistent with due process requirements, and is necessary for the sound administration of the criminal justice system.

This court has recognized that evidence destroyed by the prosecution could deny a defendant due process, ". . . given the showing that the evidence was clearly material to the issue of guilt or innocence." *State v. Amundson,* 69 Wis. 2d 554, 578, 230 N.W.2d 775 (1975). In *State v. Walstad,* 119 Wis. 2d 483, 351 N.W.2d 469 (1984), decided today, the majority opinion, which I joined, held that the destruction of a breathalyzer test ampoule did not deny the defendant due process. Slip op. at 486, *infra.* The record below clearly showed that the used test ampoule could not be retested so as to provide material evidence. The majority noted that the test ampoule ". . . was not material evidence of the defendant's guilt or innocence, because the ampoule, had it been preserved, could not have been retested or reexamined in a manner that would provide relevant evidence either in respect to the accuracy of the original test or to the guilt or innocence of the defendant." Slip op. at 486, *infra.*

A far different situation is presented, however, when the state or its agents has taken a blood sample from a defendant for testing purposes, and all or part of the sample remains after the tests have been completed, and then all or part of the sample is destroyed, thereby precluding the defendant from conducting *any* type of scientific tests on the sample. Scientific literature indicates that a blood sample, unlike a breath ampoule, remains testable for many purposes for several months after it is taken if the sample has been properly stored. *See, e.g.,* Stewart and Stolman, *Toxicology Mechanisms and Analytical Meth-*

*ods*, Vol. II at 116–17 (1961) ; *Alcohol and the Impaired Driver*, American Medical Association, at 68–72 (1968). Thus, unlike a breathalyzer test ampoule, if all or part of a blood sample remains after it is tested by the state, and that remaining portion is properly stored, it is possible that the remainder could be tested for blood alcohol content months after the sample was taken, and could yield results that are material to the defendant's innocence or guilt with respect to a charge relating to intoxication.

Additionally, it is possible that a properly stored blood sample, unlike a breathalyzer test ampoule, could be tested several months after it was taken for purposes in addition to determining blood alcohol content, such as determining blood type and the presence or absence of foreign matter. In a given case, a determination of blood type could be material to a defendant's guilt or innocence. For example, suppose a defendant has reason to believe that the sample upon which the state is relying is not his or her blood, and that the chain of custody is faulty. If the state or its agents has destroyed the blood sample, and the defendant is therefore unable to conduct a test on the sample to determine blood type, the defendant might be foreclosed from conclusively proving his or her innocence.

In addition, suppose a defendant is arrested for homicide or injury by intoxicated use of a vehicle, and the state or its agents destroys that part of the defendant's blood sample remaining after the state has tested for blood alcohol content. Suppose further that the defendant's defense is that the cause of the faulty driving was not the level of intoxication at the time of arrest, but was due to some other factor which could be established by showing the presence of foreign matter in the blood. Presumably, the presence or absence of foreign matter in the blood sample would be material to the defendant's guilt or innocence, yet the defendant would be precluded by the state's destruction of the sample from conducting a test

to show the presence or absence of such foreign matter. This in turn could prevent the defendant from conclusively establishing his or her innocence. The destruction of the blood sample under circumstances described in these examples might well deny a defendant due process.

I would therefore hold that: 1) if the state has taken a blood sample and in good faith subjected it to scientific tests; and 2) if an amount sufficient for further testing remains but is then non-maliciously destroyed before the defendant can test it; and 3) if the defendant establishes the materiality of the blood sample, then the test results are inadmissible in evidence unless the state can show that it had established, enforced, and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve the evidence. This holding would not apply if the state, in good faith, had subjected the sample to scientific testing and the sample was destroyed because of the nature of the testing process. Given the minimal burden that would be imposed on the state by requiring preservation of blood samples as long as they remain material, I believe such a holding is necessary both to fully safeguard the due process rights of defendants, and to promote the sound administration of the criminal justice system.

I would apply the above holding prospectively only. In this case and in all prior cases dealing with the non-malicious destruction of blood samples by the state, I would hold that in order for the results of a blood test to be admitted into evidence, *if* the defendant establishes materiality, the state must show beyond a reasonable doubt that the non-malicious destruction of the evidence was accidental or was pursuant to routine practice or procedure established by the state or its agents.

In this case, it is undisputed that the blood sample was destroyed pursuant to routine practice. In addition, there

is no evidence that the sample was destroyed in bad faith. Therefore, I agree with the majority that the test results should not be suppressed.

I am authorized to state that JUSTICE WILLIAM G. CALLOW joins in this concurring opinion.