STATE of Wisconsin, Plaintiff-Respondent,

v.

Jessica M. WEISSINGER, Defendant-Appellant.†

Court of Appeals

*No. 2013AP218–CR. Submitted on briefs January 16, 2014.
—Decided June 25, 2014.*

2014 WI App 73

(Also reported in 851 N.W.2d 780.)

† Petition for Review granted October 15, 2014.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Gerald P. Boyle* of *Boyle, Boyle & Boyle, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Michael C. Sanders*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. NEUBAUER, P.J. Jessica M. Weissinger appeals from a judgment convicting her of causing great bodily harm by intoxicated use of a motor vehicle while having a detectable amount of a restricted controlled substance in the blood, WIS. STAT. § 940.25(1)(am) (2011–12),[1] and operating a motor vehicle while having a detectable amount of a restricted controlled substance in the blood, WIS. STAT. § 346.63(1)(am), second offense. Weissinger hit and seriously injured a motorcyclist while driving her vehicle. Weissinger consented to a blood test. When she later moved to retest the blood

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

sample, it had been destroyed. The admission of the blood test results did not violate Weissinger's due process rights. We affirm.

## FACTS

¶ 2. On July 6, 2009, the vehicle Weissinger was driving struck a motorcycle, severely injuring the operator of the motorcycle. At the scene, the police did not suspect Weissinger of being under the influence of an intoxicant. Weissinger was not arrested. Nevertheless, the police asked Weissinger to consent to give a blood sample, which she did.

¶ 3. An officer took her to the hospital, without arresting her and without handcuffs, and hospital personnel drew Weissinger's blood. The blood sample was sent to the Wisconsin State Laboratory of Hygiene, where it was tested on July 13, 2009. The sample showed no alcohol. The lab report indicated that the "[s]pecimen(s) will be retained no longer than six months unless otherwise requested by agency or subject." On August 7, 2009, Weissinger's blood was tested again, this time for drugs. The test revealed a detectable amount of tetrahydrocannabinols (THC). A February 24, 2010 test confirmed the presence of THC in Weissinger's blood.[2] The results of that test were reported on March 7, 2010. The blood sample was discarded near the end of April 2010 because it was outside the six-month retention period. According to Weissinger, the results of the tests were not furnished to her until after August 18, 2010.

---

[2] Additional blood tests were done that detected the presence of oxycodone, fluoxetine and norfluoxetine, all at therapeutic levels. These drugs did not form the basis of the charges against Weissinger.

550

¶ 4. On May 24, 2010, Weissinger was charged with causing injury while having a detectable amount of a controlled substance in her blood and operating a motor vehicle while having a detectable amount of a controlled substance in her blood. One year later, Weissinger moved to retest her blood sample and to dismiss the charges because the blood sample had been destroyed and she could not retest. The State moved to preclude Weissinger from questioning the State's witnesses about the destruction of the blood sample. The trial court denied all three motions. Weissinger's case was tried to a jury, and she was found guilty and convicted on both charges.

## DISCUSSION

¶ 5. Weissinger argues that the trial court erred in allowing the State to present evidence of the blood test results because Wis. Stat. § 971.23(5) gave her the right to retest the blood sample and because the failure to preserve the blood sample denied her due process.

¶ 6. The State responds that Wis. Stat. § 971.23 does not allow for discovery of the blood sample itself, but rather only the blood test results. Weissinger's due process rights were not violated because she had the opportunity to have an additional test and to challenge the test results on cross-examination. Finally, argues the State, Weissinger has not shown that the blood sample was apparently exculpatory or that the State acted in bad faith in destroying the blood sample.

### Standard of Review

■■

¶ 7. We review the trial court's evidentiary decisions for an erroneous exercise of discretion. *State v. Munford*, 2010 WI App 168, ¶ 27, 330 Wis. 2d 575, 794

N.W.2d 264. Whether Weissinger's due process rights were violated is a question of law we review de novo. *Id.*, ¶ 20.

## United States Supreme Court Cases Regarding Destruction of Potentially Useful Evidence

■■

¶ 8. The Due Process Clause of the Fourteenth Amendment requires that criminal prosecutions conform to fundamental notions of fairness and that criminal defendants are given "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984); *see also* U.S. CONST. AMEND. XIV, § 1. Due process requires that the prosecution disclose material exculpatory evidence to the defense. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963).

¶ 9. In *Trombetta* and *Arizona v. Youngblood,* 488 U.S. 51 (1988), the U.S. Supreme Court developed a test to determine whether the government's failure to preserve evidence violated a defendant's due process rights. Trombetta and other respondents challenged convictions for drunk driving after the breath samples showing their blood alcohol content were destroyed before they could independently test the samples. *Trombetta,* 467 U.S. at 483. In upholding the convictions, the Supreme Court noted that the police officers had no apparent intent to destroy exculpatory evidence but rather acted in good faith and according to their protocol. *Id.* at 488. Further, the breath test evidence was not apparently exculpatory; "the chances [were] extremely low that preserved samples would have been exculpatory." *Id.* at 489. Finally, respondents had "alternative means of demonstrating their innocence," such as attacking the reliability of the testing. *Id.* at 490.

¶ 10. Expanding on this test in *Youngblood*, the Court noted that while the prosecution must turn over material exculpatory evidence, the Supreme Court has been unwilling to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. *Youngblood* "refined" the *Trombetta* rule, distinguishing between "potentially useful evidence" and "exculpatory evidence" and requiring a showing of bad faith when the police fail to preserve evidence that is merely potentially useful. *State v. Greenwold*, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994) (*Greenwold II*) (quoting *Youngblood*, 488 U.S. at 57–58); *see also State v. Greenwold*, 181 Wis. 2d 881, 885, 512 N.W.2d 237 (Ct. App. 1994) (*Greenwold I*) (adopting *Youngblood* standard and noting refinement of *Trombetta* rule). After *Youngblood*, a defendant's due process rights as to the loss of evidence are violated if the police (1) fail to preserve evidence that is apparently exculpatory or (2) act in bad faith by failing to preserve evidence that is potentially exculpatory. *Greenwold II*, 189 Wis. 2d at 67 (citing *Trombetta*, 467 U.S. at 489, and *Youngblood*, 488 U.S. at 57–58). Thus, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. Bad faith can only be shown if "(1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; *and* (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence." *Greenwold II*, 189 Wis. 2d at 69.

¶ 11. The *Youngblood* rule applies even when the defense has made a discovery request for potentially useful, outcome-determinative evidence; there is no due process violation from the destruction of such evidence unless the defendant can show the evidence was destroyed in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam). Fisher was charged with possession of cocaine and made a discovery request for the bag of powdery substance the police had seized which had tested positive four times for cocaine. *Id.* at 545. Fisher fled the state, and when he returned, ten years later, the evidence had been destroyed. *Id.* Fisher was convicted, but his conviction was overturned on appeal. *Id.* at 546. The Illinois appellate court relied on *Illinois v. Newberry*, 652 N.E.2d 288 (Ill. 1995), distinguishing *Youngblood* on the grounds that Fisher had requested the evidence and the evidence was Fisher's "only hope for exoneration." *Fisher*, 540 U.S. at 546–47. The Illinois Supreme Court did not take the case. *Id.* at 547.

¶ 12. The United States Supreme Court took the case and reversed. *Id.* at 545. The Court reiterated the necessity of a finding of bad faith in order to show a due process violation when potentially exculpatory evidence has been destroyed. *Id.* at 547–48. "We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police." *Id.* at 548. "We also disagree that *Youngblood* does not apply whenever the contested evidence provides a defendant's 'only hope for exoneration' and is 'essential to and determinative of the outcome of the case.' " *Id.* (citation omitted). The applicability of the *Youngblood* bad-faith requirement depends on whether the evidence was exculpatory or just potentially useful, not on whether the evidence was central to the state's case. *Fisher*, 540 U.S. at 549. The

destroyed substance in Fisher's case, having tested positive for cocaine four times, was, at best, potentially useful, so the bad-faith requirement applied. *Id.* at 548–49.

¶ 13. *Fisher* tells us that *Youngblood* applies to Weissinger's case even though the destruction of the evidence prevented an independent test and the blood sample test result arguably determined the outcome of the case.[3] Applying the *Youngblood* analysis, Weissinger has not shown that the blood sample was apparently exculpatory at the time it was destroyed. Indeed, the

---

[3] The dissent attempts to distinguish *Illinois v. Fisher*, 540 U.S. 544 (2004) (per curiam), on the fact that Fischer had the opportunity to independently test the evidence but instead fled the state. The *Fisher* decision did not turn on these facts, but on whether the evidence had exculpatory value. *See also, e.g., People v. Kizer*, 851 N.E.2d 266, 269, 275 (Ill. App. Ct. 2006) (no due process violation where state destroyed blood evidence prior to filing of amended information); *State v. Hawkinson*, 829 N.W.2d 367, 370, 373 (Minn. 2013) (upholding conviction predicated on blood evidence that was destroyed after defendant had requested its preservation); *Commonwealth v. Borovichka*, 18 A.3d 1242, 1250–52 (Pa. Super. Ct. 2011) (no due process violation where inculpatory blood sample was destroyed prior to issuance of summons). The dissent also cites Justice Stevens' concurrence in *Arizona v. Youngblood*, 488 U.S. 51 (1988), but Justice Stevens' outcome-determinative approach was not adopted by the *Youngblood* majority or the *Fisher* majority. *Fisher*, 540 U.S. at 549 (Stevens, J., concurring). The dissent cites no post-*Youngblood* authority for the proposition that the destruction of inculpatory evidence prior to an opportunity to independently test is dispositive, nor any post-*Greenwold* Wisconsin authority. *Compare State v. Greenwold*, 181 Wis. 2d 881, 885, 512 N.W.2d 237 (Ct. App. 1994) (*Greenwold I*), *and State v. Greenwold*, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994) (*Gree n wold II*), *with State v. Amundson*, 69 Wis. 2d 554, 577–78, 230 N.W.2d 775 (1975).

sample was inculpatory.[4] The sample had tested positive twice for THC, showing both times that Weissinger had controlled substances in her blood at the time of the accident. Weissinger herself admits that the retest could only "hopefully find that the test of the blood was not correct." Because the evidence Weissinger sought was only "potentially useful" rather than apparently exculpatory, she would have to show that it was destroyed in bad faith. *See Youngblood*, 488 U.S. at 58. Weissinger makes no such assertion.[5]

---

[4] Evidence that has been tested by government agents and appears to be inculpatory is not apparently exculpatory. Elizabeth A. Bawden, *Here Today, Gone Tomorrow—Three Common Mistakes Courts Make When Police Lose or Destroy Evidence With Apparent Exculpatory Value*, 48 Clev. St. L. Rev. 335, 343 (2000). *See also, e.g., Fisher*, 540 U.S. at 548 ("[P]olice testing indicated that the chemical makeup of the substance inculpated, not exculpated, respondent . . . ."); *Kizer*, 851 N.E.2d at 271–75 (destruction of blood samples prior to independent testing did not deprive defendant of due process); *Hawkinson*, 829 N.W.2d at 373 (destruction of sample that produced inculpatory results did not constitute denial of due process absent showing of bad faith); *Harness v. State*, 58 So.3d 1, 4–6 (Miss. 2011) (no due process violation in destruction of blood sample that had shown inculpatory test results four times; sample was not apparently exculpatory); *State v. Hall*, 768 P.2d 349, 350 (Nev. 1989) (no showing of bad faith where chemist disposed of inculpatory blood sample according to routine practice); *Borovichka*, 18 A.3d at 1250–52 (no due process violation where inculpatory blood sample was destroyed prior to issuance of summons); Jamie S. Gorelick et al., Destruction of Evidence § 6.8 (2014) (collecting cases holding that failure to preserve potentially useful evidence does not violate due process unless defendant shows it was destroyed in bad faith).

[5] Weissinger's reliance on *State v. Hahn*, 132 Wis. 2d 351, 392 N.W.2d 464 (Ct. App. 1986), is misplaced. Hahn's theory of defense was that a mechanical defect in his truck, not his intoxication, caused the crash. *Id.* at 358–59. The truck had been dismantled by the time Hahn asked to inspect it. *Id.* at

## Pre-existing Wisconsin Law on
## Destruction of Potentially Useful Evidence

¶ 14. Under *Youngblood*, *Greenwold I*, and *Greenwold II*, Weissinger has shown no due process violation. The *Greenwold II* court expressly rejected the argument that, in an evidence destruction case, the due process clause of the Wisconsin Constitution affords greater protection than that of the United States Constitution. *Greenwold II*, 189 Wis. 2d at 71. Weissinger does not argue otherwise. Nevertheless, we address Weissinger's other arguments based on Wisconsin's criminal discovery statute and pre-*Youngblood/Greenwold* cases.

¶ 15. Weissinger argues that, under pre-*Youngblood/Greenwold* Wisconsin precedent, her due process rights were violated when the state lab destroyed the blood sample before she was charged. Although decided before the *Youngblood* analysis was set forth by the Supreme Court, in *State v. Disch*, 119 Wis. 2d 461, 478–79, 351 N.W.2d 492 (1984), and *State v. Ehlen*, 119 Wis. 2d 451, 456, 351 N.W.2d 503 (1984), the supreme court rejected the defendants' arguments that

---

354. Unlike Weissinger, however, Hahn had a witness who was able to testify that the truck had a defective steering mechanism. *Id.* at 359. Furthermore, the fact that the State impounded the truck showed that the State recognized its apparent exculpatory value. *Id.* at 360. More importantly, the *Hahn* court relied on *California v. Trombetta*, 467 U.S. 479 (1984), under which the defense had to show that the evidence might be expected to play a significant role in the defense. *Trombetta*, 467 U.S. at 488. The *Trombetta* rule was "refined" by *Youngblood*, 488 U.S. at 51. *See Greenwold I*, 181 Wis. 2d at 885 (noting *Youngblood*'s refinement of *Trombetta* rule); *Greenwold II*, 189 Wis. 2d at 67 (noting *Youngblood*'s departure from *Trombetta*).

their due process rights were violated when the original blood samples were no longer available for retesting.[6]

WISCONSIN STAT. § 971.23

¶ 16. First, the supreme court rejected an argument Weissinger makes here: that the blood sample— evidence that she hoped would aid in her defense—was destroyed in violation of her right under WIS. STAT. § 971.23(5) "to inspect and perform tests on any physical evidence the State had in its possession." *Disch*, 119 Wis. 2d 478–79. Section 971.23(5) provides that "the court may order the production of any item of physical evidence which is intended to be introduced at the trial for scientific analysis under such terms and conditions as the court prescribes." While § 971.23(5) gives a defendant the right to inspect reports of the results of blood tests, it does not provide for inspection or testing if the blood itself is not going to be introduced into evidence. *Disch*, 119 Wis. 2d at 478–79. The *Disch* court held that no statute or case law required production of the sample, and consequently, "[n]o duty devolves upon the district attorney to preserve or maintain a quantity of a blood sample in order that a defendant may retest the blood." *Id.*; *see also Ehlen*, 119 Wis. 2d at 452–53 (a blood sample is not "evidence intended, required, or even susceptible of being produced by the state under

---

[6] In its due process analysis, the *Disch* court also focused on whether the defendant could show that the missing evidence was material at the time the defense requested it. *State v. Disch*, 119 Wis. 2d 461, 463, 468, 351 N.W.2d 492 (1984). We are to assess the constitutional materiality of the evidence in question at the time of its destruction. *Trombetta*, 467 U.S. at 489 ("[E]vidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed . . . .").

the provisions of [§] 971.23(4) and (5) [(1979–80)]"). The blood sample itself was not subject to discovery under § 971.23(5).

## Admissibility Under Wis. Stat. § 885.235

¶ 17. The *Disch* court also noted that blood test results for alcohol were statutorily admissible per se under Wis. Stat. § 885.235 (1979–80), and it would be error to exclude the results from evidence. *Disch*, 119 Wis. 2d at 473. The court held that the blood test was entitled to a prima facie presumption of accuracy. *Id.* at 475. The current version of § 885.235 also provides that chemical evidence of a detectable amount of a controlled substance in a person's blood is prima facie evidence in an action in which it is material to prove a detectable amount of a controlled substance in the defendant's blood. Sec. 885.235(1k). Under the comment to the corresponding jury instruction, the statute's definition that such evidence makes a prima facie case "strongly implies" that such evidence is admissible. Wis JI—Criminal 1266 at 6. Thus, the blood test results here were admissible under the statute whether or not Weissinger had an opportunity to conduct her own testing.

## Ability to Challenge Testing
## Procedure as Due Process Safeguard

¶ 18. The *Disch* court went on to hold that due process is afforded by the disclosure of the blood test results and the right to cross-examine regarding the accuracy and credibility of the analysis. *Disch*, 119 Wis. 2d at 463, 477–79. The court further noted that a defendant's due process rights will be preserved by his

or her opportunity to obtain additional tests at the time of the arrest. *Id.* at 462–63; *see also Ehlen*, 119 Wis. 2d at 452–53.

¶ 19. Weissinger was able to cross-examine persons in the chain of custody as well as persons involved in the testing of her blood sample. Additionally, the trial court allowed Weissinger to examine the State's witnesses regarding the destruction of the blood sample. Thus, the only difference between this case and *Disch* and *Ehlen* is that in those cases the defendants were arrested and advised of their ability to obtain further tests. *See* WIS. STAT. § 343.305(2)-(4). Weissinger was not under arrest, and thus the officer was under no obligation to advise her regarding additional tests. That factual difference does not compel a different result here. *Youngblood, Greenwold I,* and *Greenwold II* establish the test we must apply to determine whether there has been a due process violation by the destruction of evidence. Weissinger has not shown that the destroyed test was apparently exculpatory or that the test was destroyed in bad faith.

## CONCLUSION

¶ 20. The dissent cites articles suggesting that laboratory results are not always reliable. Weissinger points to nothing to suggest that her test results were unreliable. If the general reliability of routine blood testing on samples that are likely to be outcome determinative is questionable, then the supreme court or the legislature is the proper body to address this issue. Justice Bablitch urged, in his concurrence in *Ehlen*, 119 Wis. 2d at 460 (Bablitch, J., concurring), the adoption of a requirement that the state preserve blood samples if the defendant establishes the materiality of the sample,

opining that such a rule "is necessary both to fully safeguard the due process rights of defendants, and to promote the sound administration of the criminal justice system." We, however, are bound by the Wisconsin Supreme Court decisions in *Disch* and *Ehlen*, as well as the *Youngblood* standard adopted in *Greenwold I* and *Greenwold II. See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) (court of appeals cannot modify supreme court holdings or overrule court of appeals precedent).

¶ 21. Weissinger maintains that her due process rights were violated when the State introduced test results from a blood sample that had been destroyed. Weissinger has not shown that the blood sample was apparently exculpatory and therefore has not shown a violation of due process. The trial court properly admitted the blood test results.

*By the Court.*—Judgment affirmed.

¶ 22. BROWN, C.J. (*concurring*). I certainly understand where the dissent is coming from. The defendant, Weissinger, was not initially arrested following a bad accident. She voluntarily had her blood tested and she heard nothing for months. During that time, the blood first was tested for alcohol and came back negative. Three weeks later, in August 2009, the blood was screened for drugs and came back positive for THC. The State did nothing with this result at that time. In September and October 2009, and then in January 2010, additional drug screenings were run to detect and measure levels of various prescription drugs. Finally, in February 2010, another test of the sample confirmed the presence of THC. Then, in April 2010, the sample itself, which had undergone six different tests, was

destroyed due to lab protocol. In May 2010, after the sample had already been destroyed, charges were filed against Weissinger.

¶ 23. As I read the dissent, it is contending that, if the State was going to test a sample multiple times without Weissinger's knowledge and before deciding to press charges, the sample should have been preserved so that Weissinger could test it once. By not giving her notice of what the State was doing and giving her a chance to test the sample herself, I read the dissent as saying that the State blindsided her.

¶ 24. I agree that what the State did and the way the facts unfolded is troubling. But Weissinger did not raise bad faith as an issue, and the dissent cannot therefore use the term "bad faith" in its separate opinion.

¶ 25. Why is this term important? It is important because *Arizona v. Youngblood*, 488 U.S. 51 (1988), established a bright-line rule. As the federal cases following *Youngblood* have confirmed, the defendant must either show that the destroyed sample was "apparently exculpatory" or, if the defendant cannot meet that burden, that it was "potentially useful" and the State acted in bad faith by failing to preserve it. *See id.* at 57–58; *State v. Greenwold*, 189 Wis. 2d 59, 68–69, 525 N.W.2d 294 (Ct. App. 1994) (*Greenwold II*) (discussing *Youngblood*).

¶ 26. The dissent makes a valiant attempt to distinguish *Youngblood* on its facts. Of primary importance, the dissent notes that, unlike in other destroyed blood test cases such as *State v. Disch*, 119 Wis. 2d 461, 351 N.W.2d 492 (1984) and *State v. Ehlen*, 119 Wis. 2d 451, 351 N.W.2d 503 (1984), Weissinger was never informed that she could have an alternative test. The dissent posits that the ability to have an alternative test

is an important precondition in showing that the defendant's due process was satisfied even though the sample was destroyed. The problem with that is that *Youngblood* superseded *Disch* and *Ehlen* and all the other cases placing importance on the ability of the defendant to have been offered an alternative test. Nowhere does *Youngblood* say that having the ability to take an alternative test is a precondition to satisfying due process concerns. I say again: *Youngblood* established a bright-line rule. The United States Supreme Court all but came out and said so in *Illinois v. Fisher*, 540 U.S. 544 (2004). No matter how one tries to distinguish *Youngblood* on its facts, the rule is plain on its face.

¶ 27. The other factor that the dissent claims distinguishes *Youngblood* is that the blood evidence in this case was so critical to the prosecution. However, as a recent article in the magazine of the National Association of Criminal Defense Lawyers observed, the vast majority of courts reject the view that *Youngblood* applies differently when evidence is especially critical:

> Not surprisingly, when evidence is lost it is usually deemed potentially exculpatory because, as in *Youngblood*, it is hard to prove that the evidence could help exonerate the accused without possessing the evidence in order to test it. At least one court, however, has looked at how critical the evidence is in determining its materiality. Specifically, in *United States v. Belcher*, [762 F. Supp. 666, 672 (W.D. Va. 1991)], the Western District of Virginia applied the *Trombetta* materially exculpatory standard to destroyed marijuana plants because they were critical to the government's case and used in its case in chief. But . . . the majority of courts have rejected this approach and would find such evidence only potentially exculpatory and thus subject to the *Youngblood* bad faith analysis.

Marcia G. Shein, *Cover Story: The Government's Use of Lost Evidence,* 38 Champion 26, 27 (Jan./Feb. 2014) (footnotes omitted). What is more, the very same court that issued the leading case supporting the dissent's view, *Belcher,* later retreated from that view, based on *Fisher's* admonition that "the applicability of the bad faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case . . . but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." *Crews v. Johnson,* 702 F. Supp. 2d 618, 633 (W.D. Va. 2010) (quoting *Fisher,* 540 U.S. at 548–49 (2004)) (alteration in *Crews*). On this ground, the court stated, "notwithstanding *Belcher* . . . clearly established Federal law after *Youngblood* does not permit an exception even if the evidence is crucially important to the prosecution's case." *Crews,* 702 F. Supp. 2d at 633.

¶ 28. In my view, the dissent is taking the same tack as the court did in *Belcher.* That is a lonely existence and one that is, in the view of almost every other court, inconsistent with what *Youngblood* stands for. No matter how much the dissent tries to limit *Youngblood* to its facts, practically every other court that has faced a *Youngblood* issue sees the strength of that case for what it is. Many courts do not like it. But they do not try to get around it. They reject it and rely on state constitutional law to arrive at a different test.

¶ 29. I must say that I do not like *Youngblood.* I simply do not understand how a person can show that the destroyed sample was apparently exculpatory when the sample cannot be tested to determine *whether* the sample has exculpatory value. It sets up an illusion. It would have been okay if the test was whether the sample could be shown to be "potentially useful." But that test does not have applicability unless the defen-

dant can also show bad faith. The bad faith component devised by the Supreme Court sets such a high bar, it is virtually impossible to overcome.

¶ 30. I am not alone in my distaste for *Youngblood*. Several courts and commentators have criticized the case, and a number of states have held that their state constitutions require a balancing test instead.[1]

[1] *See, e.g., Commonwealth v. Henderson*, 582 N.E.2d 496, 497 (Mass. 1991) (rejecting *Youngblood* and applying the standard under the Massachusetts state constitution because "[t]he fact that police did not act in bad faith when they negligently lost the potentially exculpatory evidence cannot in fairness be dispositive"); *State v. Merriman*, 410 S.W.3d 779, 784–85 (Tenn. 2013) (explaining that "the due process required under the Tennessee Constitution [is] broader than the due process required under the United States Constitution" and therefore requires a balancing test instead of the "strict 'bad faith' analysis" of *Youngblood*); *Thorne v. Department of Pub. Safety*, 774 P.2d 1326, 1330 n.9 (Alaska 1989) ("Our construction of the Alaska Constitution reflects our agreement with Justice Stevens' belief that there may be cases 'in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair' " (citation omitted)).

*See also* Norman C. Bay, *Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 WASH. U. L. REV. 241, 247 (2008) (explaining that "the bad faith standard imposes an almost insurmountable burden upon the accused" and that in "two decades, only a handful of courts have found due process violations"); Teresa N. Chen, *The Youngblood Success Stories: Overcoming the "Bad Faith" Destruction of Evidence Standard*, 109 W. VA. L. REV. 421, 422 (2007) (stating that "what was initially hailed as an almost 'impossible' standard by critics has almost proven to be just that," and finding in 2007 that in more than 1500 published cases citing *Youngblood*, only seven found bad faith); Daniel R. Dinger, Note, *Should Lost Evidence Mean a Lost Chance to Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood*, 27 AM. J. CRIM. L. 329, 365 (2000) (quoting criminal law

But our court has held that our state constitutional protections are equivalent to the federal protections in this regard, and so we are bound by it. *See Greenwold II*, 189 Wis. 2d at 71. I see only two avenues for resolving destroyed blood sample issues in a manner that would be fair. Our supreme court can announce its own standard based on the state constitution as several other states have done. Or, alternatively, the legislature could enact a statute requiring that the sample be kept for an appreciable period of time after the defendant is charged. There are statutes preventing destruction of DNA samples. It would not be difficult to enact a statute prohibiting destruction of a blood sample until after a certain time period following the filing of the charging document.

¶ 31. REILLY, J. (*dissenting*). A criminal justice system that allows the government to destroy the sole evidence of a person's guilt prior to notice, charging, or a meaningful opportunity for the accused to inspect the State's evidence is fundamentally unfair. The State charged Weissinger with having something in her blood, but then destroyed the blood prior to giving Weissinger any meaningful opportunity to inspect the blood. It is a perversion of justice that we apparently accord more due process evidentiary protection to our property than we accord to our liberty interests. I respectfully dissent

professor Charles H. Whitebread's statement that the *Youngblood* standard means "it is 'virtually impossible for defendants to prove bad faith' ").

As the dissent points out, in view of the defendant Youngblood's ultimate exoneration of the vicious crimes via DNA evidence, and the fact that the real perpetrator was thereafter brought to justice, "[i]ronically, the rule of law established by [*Youngblood*] was founded upon the conviction of an innocent man." Bay, 86 WASH. U. L. REV. at 243–44.

—the government may not take the liberty of one of its citizens without allowing that citizen a meaningful opportunity to examine the evidence offered by the State.

¶ 32. In civil court, we impose a duty upon every party or potential litigant to preserve evidence essential to a claim that will likely be litigated. *Sentry Ins. v. Royal Ins. Co. of Am.*, 196 Wis. 2d 907, 918, 539 N.W.2d 911 (Ct. App. 1995). A party or potential litigant with a legitimate reason to destroy evidence must provide reasonable notice to the affected party "of a possible claim, the basis for that claim, the existence of evidence relevant to the claim, and a reasonable opportunity to inspect that evidence" before its destruction. *American Family Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶ 5, 319 Wis. 2d 397, 768 N.W.2d 729. We impose sanctions in civil court for the destruction of evidence for two main purposes: "(1) to uphold the judicial system's truth-seeking function and (2) to deter parties from destroying evidence." *Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI App 15, ¶ 16, 269 Wis. 2d 286, 674 N.W.2d 886 (2003). Those two purposes should likewise exist when we seek to take someone's liberty.

¶ 33. By supporting the State's destruction of evidence in this criminal case, the majority makes two critical errors: (1) it misreads *Arizona v. Youngblood*, 488 U.S. 51 (1988), as permitting the State's precharging destruction of inculpatory evidence, Majority, ¶ 13, and (2) it relies on a due process protection (cross-examination) that is inadequate, *see id.*, ¶ 19.

*Youngblood Does Not Sanction*
*the Precharging Destruction of Inculpatory Evidence*

¶ 34. The majority's misapplication of *Youngblood* becomes apparent when examining the three types of evidence that are collected by the government in build-

567

ing a criminal case. One type of evidence is exculpatory evidence. Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the State is required to turn over favorable, material evidence to a criminal defendant upon request. We know from *Brady* that if the State knew that evidence in its possession had an exculpatory value, the destruction or suppression of that evidence would be a due process violation regardless of the good or bad faith of the State. *Id.*

¶ 35. Another type of evidence is all that material that is collected by the State in the course of its investigation, but which is not used at trial. It is this second type of evidence that was at issue in *Youngblood*. The evidence in *Youngblood* was clothing that the government had not properly refrigerated such that scientific testing was not possible. *Youngblood*, 488 U.S. at 53–54. The clothing was not inculpatory evidence and the government did not attempt to make use of this evidence in its case-in-chief. *Id.* at 56. The clothing was also not known by the government to be exculpatory. *Id.* at 54. In rejecting dismissal as a sanction for the government's failure to preserve this evidence for potential use at trial, the *Youngblood* Court stated that it was unwilling to read the "fundamental fairness" requirement of the Due Process Clause as imposing on the government an "undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58. The majority errs when it reads this passage as imposing no duty on the government to preserve nonexculpatory evidence absent a showing that the State destroyed the nonexculpatory evidence in "bad faith."[1]

---

[1] Which begs the question: why would the government engage in the *bad faith* destruction of evidence that has value to the government and no exculpatory value to the defendant?

¶ 36. At the opposite end of the spectrum from *Brady* exculpatory evidence is a third type of evidence: inculpatory evidence. As stated by the majority, Weissinger's blood falls into this classification. Majority, ¶ 13. Wisconsin Stat. § 346.63(1)(am) is a strict liability crime that requires the State to prove two elements beyond a reasonable doubt: (1) that Weissinger was operating a motor vehicle on a highway and (2) that Weissinger had a detectable amount of a restricted controlled substance in her *blood* at the time she operated her vehicle. Wis JI—Criminal 2664B. Without Weissinger's blood, the State could not prove beyond a reasonable doubt that Weissinger had a detectable amount of a restricted controlled substance "in her blood" at the time she operated her vehicle on July 6, 2009.

¶ 37. The majority justifies the precharging destruction of inculpatory evidence in Weissinger's case by relying on a series of factually distinguishable cases. In *Illinois v. Fisher*, 540 U.S. 544, 545–56, 548 (2004) (per curiam), for example, the Court found that police did not violate a criminal defendant's due process rights when they destroyed inculpatory evidence of his possession of cocaine more than ten years after charging and while the defendant was on the lam. *Fisher* does not tell us that *Youngblood* applies to Weissinger's case, Majority, ¶ 13, as Fisher had a meaningful opportunity to test the evidence against him, but he chose to flee the state instead. Weissinger had no such opportunity.

¶ 38. The proper reading of *Youngblood* and its cohorts is not as permitting the precharging destruction of inculpatory evidence, but as an unwillingness to impose "an undifferentiated" duty on the government to retain and preserve "all material that might be of conceivable evidentiary significance in a particular

prosecution." *See Youngblood*, 488 U.S. at 58. Read this way, *Youngblood*'s application to Weissinger is inappropriate as Weissinger's case does not concern itself with evidence that might be of "conceivable evidentiary significance"; it concerns inculpatory evidence. Nor does requiring the government to preserve evidence until a criminal defendant has an opportunity to inspect or examine it, i.e., postcharging, impose a duty incompatible with *Youngblood*.

¶ 39. We often say that a criminal defendant is "entitled to a fair trial, not a perfect trial." *State v. Hanson*, 2000 WI App 10, ¶ 20, 232 Wis. 2d 291, 606 N.W.2d 278 (1999). The sad fact is that the evidence at issue in *Youngblood* was in fact exculpatory evidence rather than evidence "that might be of conceivable evidentiary significance." *See Youngblood*, 488 U.S. at 58. Fortunately, preservation of the evidence at issue in *Youngblood* ultimately "uph[e]ld the judicial system's truth-seeking function." *See Cease Elec. Inc.*, 269 Wis. 2d 286, ¶ 16. Twelve years after the Supreme Court decided *Youngblood* and after Larry Youngblood had served his prison sentence, advances in science proved his innocence. Barbara Whitaker, *DNA Frees Inmate Years After Justices Rejected Plea*, N.Y. TIMES, Aug. 11, 2000, at A12. The evidence that the *Youngblood* Court held "might be of conceivable evidentiary significance" was the same evidence that later exonerated him. *See* Karen McDonald Henning, *The Failed Legacy of Absolute Immunity Under Imbler: Providing a Compromise Approach to Claims of Prosecutorial Misconduct*, 48 GONZ. L. REV. 219, 271 n.270 (2012). Youngblood may not have received a perfect trial, but at least he was able to clear his name based on the government's preservation of evidence that the majority dismisses as being "only 'potentially useful.' " Majority, ¶ 13.

## The Majority's Reliance on
## Cross-Examination Is Inadequate

¶ 40. We recently released *State v. Luedtke*, 2014
WI App 79, 355 Wis. 2d, 436, 851 N.W.2d 837, which
offers a good parallel as to why I joined the majority in
*Luedtke* but dissent here. Luedtke was charged with the
same crime as Weissinger—having a detectable amount
of a restricted controlled substance in his blood under
WIS. STAT. § 346.63(1)(am)—and Luedtke made the
same argument as Weissinger that his blood was de-
stroyed before he had a chance to examine or test it.
*Luedtke*, 355 Wis. 2d 436, ¶ 1. The factual similarities
end there. Luedtke:

(1) Was observed at the scene of the accident stuffing
syringes and a metal spoon down a sewer drain;

(2) Was found to have syringes, a brown prescription
bottle containing a white powder, and a metal
spoon in his car;

(3) Admitted to a police officer he had injected mor-
phine;

(4) Showed evidence of impairment on field sobriety
tests to the extent that he could not drive safely;

(5) Was arrested;

(6) Was read the Informing the Accused and advised
that he could take an alternate test free of charge
or have a test conducted by a qualified person at
his own expense;

(7) Was handcuffed;

(8) Was examined by a drug recognition expert at the
hospital;

(9) Had his blood drawn at the hospital on April 27, 2009;

(10) Was charged in a criminal complaint on December 18, 2009; and

(11) Had his blood destroyed "per state laboratory protocol" on February 4, 2010.

*Id.*, ¶¶ 2–4.

¶ 41. Luedtke received notice of his right to an alternate test and had numerous meaningful opportunities to challenge the blood evidence against him. This case is the polar opposite of *Luedtke*. The investigating officer had neither reasonable suspicion nor probable cause to believe that Weissinger was under the influence of drugs or alcohol at the time of her accident or that her ability to operate a motor vehicle was impaired. The investigating officer asked Weissinger for a voluntary blood sample as a matter of department policy. Weissinger was never arrested or taken into custody on July 6. Weissinger was never given *Miranda*[2] warnings. Weissinger was never advised that she had a right (or need) to have her own test done. Weissinger was never advised that she was the subject of a criminal investigation. In short, Weissinger never had a reason to perform her own tests back in July 2009 as the State did not threaten her liberty at that time.

¶ 42. The majority acknowledges that due process requires that criminal defendants be given "a meaningful opportunity to present a complete defense," Majority, ¶ 8, but asserts that Weissinger's right to due process is protected by her ability to cross-examine the State's witnesses, *id.*, ¶ 19. This due process protection is inadequate.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 43. A key due process protection, relied on by the Wisconsin Supreme Court in both *State v. Disch*, 119 Wis. 2d 461, 351 N.W.2d 492 (1984), and *State v. Ehlen*, 119 Wis. 2d 451, 351 N.W.2d 503 (1984), is absent in this case. Both *Disch* and *Ehlen* pointed to the right—statutorily mandated to be told to an arrestee at the time of a blood draw for alcohol or controlled substances—to have an independent blood sample drawn and tested. *Disch*, 119 Wis. 2d at 470–71, 480; *Ehlen*, 119 Wis. 2d at 457; *see also* WIS. STAT. § 343.305(4). The sanction when the State does not provide an alternate test at the accused's request is suppression of the first test. *State v. McCrossen*, 129 Wis. 2d 277, 287, 385 N.W.2d 161 (1986). The majority ignores the State's failure to provide Weissinger this due process protection.

¶ 44. Nor is reliance on the cross-examination of the State's expert meaningful as the State's experts are not infallible. About the time Weissinger's blood was tested, the Wisconsin State Laboratory of Hygiene received a failing score from the Wisconsin Department of Health Services' Division of Quality Assurance and was required to enact and "submit a corrective action plan showing root cause analysis and ensuring implementation of effective corrective action." Letter from Barbara J. Saar to Charles D. Brokopp (July 15, 2010) *available at* http://walworthbar.org/wp-content/uploads /2012/01/WSLH_AI_June-2010–PT_Corrective-Action-Documents-22. pdf. The Division of Quality Assurance found that, in a testing event in June 2010, the lab had a score of forty percent, which was a "failing event score."[3] *Id.*

---

[3] The blood sample in this case was received by the State Laboratory of Hygiene in July 2009, the test used against Weissinger was performed in February 2010, the report introduced into evidence that documented the test result was gen-

¶ 45. Nor are mistakes unheard of in crime labs. The Nassau County, New York, crime lab was shut down in February 2011 for producing inaccurate measurements in drug cases, Associated Press, *Nassau County Shuts Down Crime Lab,* N.Y. TIMES, Feb. 19, 2011, at A18; the San Francisco drug lab was shut down in 2010 and hundreds of drug cases were dismissed when it was discovered a technician was stealing drugs, Shoshana Walter, *In Scandal's Wake, Police Turn to Quick, Cheap Test for Drugs,* N.Y. TIMES, Aug. 27, 2010, at 17A; the St. Paul, Minnesota, police crime lab was discovered to have widespread problems with staff skills, equipment maintenance, and missteps in scientific processes, Chao Xiong, *Counties to Review Crime Lab Results,* STAR TRIBUNE (Minneapolis), Feb. 22, 2013, at 2B; and in Boston, a crime lab chemist was "accused of submitting false drug tests and failing to follow protocol," resulting in the reexamination of more than forty thousand cases, Milton J. Valencia, *Lab Scandal Makes Way into Federal Court System; New Chapter in Dookhan Case,* BOSTON GLOBE, Sept. 17, 2013, at B1, 12. In light of the myriad ways that such testing can go wrong, the majority's prescription that cross-examination can cure the State's destruction of the blood evidence is illusory. A person whose liberty is threatened by the government is not afforded due process protection by being restricted to asking the State's expert, "Are you really, really sure your results are correct?"

¶ 46. Additionally, the majority errs when it places the burden on Weissinger to show that the State's inculpatory evidence (her blood) was "appar-

erated in March 2010, the blood sample was destroyed in April 2010, Weissinger was charged in May 2010, and the lab received its failing event score in June 2010.

ently exculpatory" when it was destroyed by the State. Majority, ¶ 13. A defendant bears no burden of proof as to his or her innocence, much less a burden that is nearly impossible to meet. Weissinger does not have to prove the State's inculpatory evidence is exculpatory for fundamental fairness to dictate her right to test or inspect the evidence. In *State v. Amundson*, 69 Wis. 2d 554, 577–78, 230 N.W.2d 775 (1975), our supreme court held that because of the difficulty in proving the exculpatory nature of evidence that has been destroyed, a defendant need show only that the lost evidence was clearly material to his or her guilt or innocence, not that it was actually exculpatory, to trigger the government's duty to preserve the evidence. The majority ignores *Amundson*, but a brief example shows why it is good law.

¶ 47. Consider that instead of Weissinger's blood, the evidence at issue was a bag of powder found in Weissinger's car. Police had no circumstantial evidence indicating that the powder was a controlled substance and Weissinger exhibited no sign that she was using or had used illegal substances or was impaired. The police asked Weissinger if they could take the bag of powder as it was "department protocol." The State crime lab then had an expert test the powder and the expert opines/tells the prosecutor that the powder is cocaine. The prosecutor, because of work load does not charge Weissinger until after the crime lab has thrown away the bag of powder because it was too expensive for the crime lab to store evidence for more than six months.[4]

[4] The reason the blood was destroyed in Weissinger's case was not because it was no longer testable or material to the case; the reason the blood was destroyed was because the laboratory instituted a six-month retention period in response to the high volume of samples that it receives. I disagree that

The State thereafter charges Weissinger with possession of a controlled substance. Under *Amundson*, the government had a duty to preserve the powder as it was clearly material to Weissinger's guilt or innocence. Under the logic of the majority, the destruction of the powder is permissible as Weissinger has the right to ask some questions of the State expert who testifies that the powder is cocaine, even though Weissinger was never provided an opportunity to test the powder to prove that it was powdered sugar. *Cf. Fisher*, 540 U.S. at 545–56; *State v. Tarwid*, 147 Wis. 2d 95, 106, 433 N.W.2d 255 (Ct. App. 1988).

¶ 48. Simply put, the majority reads *Youngblood* too broadly. *Youngblood* is not a bright-line test when examining whether the fundamental fairness requirement of the Due Process Clause has been violated. As Justice Stevens noted in his concurrence in *Youngblood*: "[T]here may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Youngblood*, 488 U.S. at 61 (Stevens, J., concurring). To deny an accused the right to a meaningful inspection of the State's inculpatory evidence is fundamentally unfair. I dissent.

"high volume" is a justifiable reason to destroy evidence. First and foremost, one would think the State would desire not to destroy its inculpatory evidence. Second, while I do not know the cost of storing a vial of blood, I would imagine that it is much less than the cost of incarcerating an innocent person in one of our state prisons.